## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

Jon Hall, Plaintiff,

V.

*Donald Trump*, in his official capacity
as *President of the United States*;

Bill Lee, in his official capacity
as Tennessee's *Governor;*

Tony Parker, in his individual and/or
official capacity as Tennessee's *Commissioner*
*of Correction*;

**CAPITAL CASE**
No.

Tony Mays, in his individual and/or
official capacity as *Warden of R.M.S.I.*;

Michael Keys, in his individual and/or
official capacity as *Unit Manager, Death Row*,

*Warren Tate*, in his individual and/or
official capacity as *Unit Counselor, Death Row,*

Dr. Dina Kulenovic, in her individual and/or
official capacity as *Psy. D. U-2 Level board member*
    Defendants,

### INITIAL PRO SE UN-AMENDED CIVIL RIGHTS COMPLAINT
### I. INTRODUCTION

1. Plaintiff Jon Hall, a prisoner # 238941 on
Tennessee's death row, through himself, makes the
following allegations against Defendant's Donald
Trump, Bill Lee, Tony parker, Tony Mays, Mike Keys,
Warren Tate & Dr. Kulenovic (collectively Defendants),
in their individual & official capacities, based on
his personal firsthand knowledge, on information &
belief, including documents governing Plaintiff's

- 1 -

conditions of confinement on death row; records of Plaintiff's judicial proceedings in state and federal courts and in the Sixth Circuit Court of Appeals; Plaintiff's medical and mental health records while incarcerated on death row; Plaintiff's Disciplinary history on death row; records of Unit Review Panel Hearings pertaining to Plaintiff's conditions of confinement; letters, grievances and appeals plaintiff has provided to the undersigned, and to this court relating to his conditions of confinement and his medical condition and treatment; mental health evaluations conducted in connection with Mr. Hall's post-conviction proceedings; Scholarly journals, and expert reports related to the physical and psychiatric effects of solitary confinement; court opinions related to living conditions on death row, the deliberate indifference to serious medical needs, and methods of execution; and other readily available information. Mr. Hall believes that substantial, additional evidentiary support will exist for the allegations set forth in this First Complaint after consultation with experts and a reasonable opportunity for discovery.

2. **Jon Hall** has **post-conviction litigation** *pending in the* **Sixth Circuit Court of Appeals.** See Jon Hall v. Tony Mays, 6th Cir. Case # 10-5658 & 15-5436. He is *represented in those proceedings by the* **Federal Public Defender** for the **Middle District of Tennessee.** In addition, the Office of the Federal Public Defender for the Middle District of Tennessee has experience litigating death row prisoner's claims, situated in

- 2 -

similar circumstances *as the petitioner* is now
bringing, e.g. **Stephen Hugueley** v. Tony Mays, 6th Cir.
No. 17-6024, filed June 5, 2017; with current and
ongoing litigation in the United States District
Court, Middle District Tennessee, at Nashville in
**Judge Trauger's Court** in Stephen Hugueley v. Tony
Parker, et. al., No. 3:19-CV-00598.

Mr. Hall *respectfully requests:* (1) **appointment
of counsel;** (2) **time to supplement this complaint,** or
amend if necessary; and (3) to **substitute or add
additional parties** if, after a proper investigation,
including consultation with experts and the Federal
Public Defender's Office, it is determined Mr. Hall
has claims that are **appropriately joined** brought in
this proceeding regarding Tennessee's execution of Mr.
Hall. Such claims may include, but are not limited to,
whether the State's implementation of a death row
level program and prolonged isolation, without
adequate procedures, to challenge said implementation
of said policies is constitutional amounting to ex
post facto laws, as applied to Mr. Hall.

4. **Mr. Hall seeks relief** from his *prolonged and
indeterminate* **solitary confinement** at Riverbend
Maximum Security Institution (R.M.S.I.) and from the
deprivation of adequate medical care; with **one major
exclusion or difference in relief,** i.e., Mr. Hall has
not waived his appeal rights, and is **_not seeking to
be executed_.** Through the defendant's actions, taken
arbitrarily, **without legal penological interests** (Tn.
lacks subject-matter jurisdiction over a Henderson
County Indictment using a Madison County Judgment).

- 3 -

Mr. Hall's been confined in a cell alone with minimal environmental stimulation & virtually no cause for important human contact for five straight years, spending almost 24 hrs. a day in cell, 365 days a year. The cumulative effect of lengthy & indefinite solitary confinement deprive Mr. Hall adequate medical care, creating both psychological & physical harm.

4. Mr. Hall charges Defendants with violating his 1st, 4th, 5th, 6th, 8th, 9th, 10th, 13th, and 14th Amendment rights based upon misapplication of a combination of a **bill of attainder & ex post facto laws.** By misuse of federal, implied, equity powers, T.D.O.C. defendant's misapplying discretionary policies § 404.11-1; & 503.03, that bypass the checks & balances of the separation of powers under Tn. Const. Art. II, § 1, that override A STATUTORILY MANDATED PROCEDURE under T.C.A. § 41-1-103, & § 41-21-202, or 18 U.S.C. § 4081 (Classification of Prisoners), via **an unlawful delegation of legislative power** to the executive branch, under T.C.A. § 4-3-606, & § 41-24-110. <u>Fite v. State ex. rel. Snider</u>, 114 Tn. 646, 88 SW 941 (1901) (Statute may not give one branch of government authority over which another branch has power.) <u>Chambers v. Nasco</u> 111 S.Ct. 2123, 2131-32 & 3134 N.12 (1991) (**Implied power** is not a broad resovoir of power set at imperial hand; but a **necessary** limited source; not just as **a useful power.**)

## II. <u>JURISDICTION AND VENUE</u>

5. Mr. Hall's claims arise under the 1st, 4th, 5th, 6th, 8th, 9th, 10th, 13th & 14th Amend. rights and 42 U.S.C. § 1983.

- 4 -

6. This court has **pendent jurisdiction** under Art. III, § 2 and 28 U.S.C. § 1367; for claims seeking declaratory and injunctive relief pursuant to 28 U.S.C. § § 1331 and 1343(a)(3) and (4) and the (FTCA) Federal Torts Claim Act; and Declaratory Judgment Act, 28 U.S.C. § § 2201 and 2202.

7. **Venue is proper** in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391 (b)(2) in that a substantial part of the events or omissions giving rise to the claims brought by Mr. Hall have occurred in this district, as a prisoner at Riverbend.

## III. PARTIES

8. **Plaintiff Jon Hall** will be 55 years old in August 2019. He's been incarcerated in jail since August 1994. Imprisoned on a single first-degree murder conviction and sentence of death in 1997. State v. Hall 8 S.W.3d 593 (Tn 1999). As a **pretrial detainee** in Henderson County starting in August 1994. At Riverbend starting in September 1994 to February 1997, before sentence, Hall was **held in solitary confinement (30 months).** After conviction in Feb. 1997, he was placed in **Mandatory Segregation** under T.D.O.C. policy 404.11-1, & held as a **B & C-Level for over 36** months of administrative segregation. *Thus, Hall was held in the most restrictive Mandatory Segregation for a minimum of **five and a half years** before he was made a* less restrictive A-Level, as *routine procedural act*.

Detained on murder charges, Jon Hall had a (30) day **court appointed psychological exam,** at (MTMHI) Middle Tn. Mental Health Inst., in Murfreesboro Tennessee. These pretrial tests were **completed in March of 1995.**

- 5 -

After records of these proceedings were provided to court appointed counsel & reviewed, it was assumed by counsel?; that a presentation of an insanity or diminished capacity affirmative defense at trial, could not be supported by the records of the tests conducted by M.T.M.H.I., Dr. Rokeya Farroque, in 1995. In other words, it was determined **Mr. Hall did not suffer** from any significant mental illness or **brain defects,** after these records were reviewed. This position was **argued by the State** of Tennessee.

In support of Mr. Hall's federal habeas petition, Dr. Gur, the Director of Neuropsychology at the University of Pennsylvania, who in February 2008, performed a quantitative analysis of magnetic resonance imaging (MRI) and positron emission tomograph (PET) studies of the Plaintiff. Dr. Gur found that *Hall's* ***"brain revealed abnormalities in frontal, limbic and associated regions relevant to behavior,*** especially related to the interpretation of emotionally relevant information and regulation of response." CITED: <u>Jon Douglas Hall v. Ricky Bell, Warden (RMSI)</u>, 05-1199-JDB-egb (4/14/10) (Order Denying Petition, Doc. 110, page 113 [PageID1439]). Hall awaits execution in isolation, (despite written monthly reports *"no behavior problems noted."*) if his pending post-conviction is unsuccessful.

9. **Donald Trump, President** of the United States. A member of the Executive Branch, acting under color of Federal law. He shall see that laws are justly applied. United States Const., Art. II, § 3, according to oath. Hes being sued in his official capacity.

Case 3:19-cv-00628   Document 1   Filed 07/24/19   Page 6 of 51 PageID #: 6

10. **Bill Lee is Governor** of the State of Tennessee. A member of the Executive Branch acting under color of state law.. He shall see that laws of the state be justly applied. Tn. Const., Art. III, § 10, according to oath. Hes being sued in his official capacity.

11. Defendant **Tony Parker is the Commissioner** of the Tennessee Department of Correction (TDOC). He acts under color of state law, and responsible for final approval of competent humane rules applicable to maintain a safe environment for the prisoners by hiring only adequately trained staff to hold positions of trust in the Department of Correction. He can perform ministerial acts himself, as part of the Commissioner's review board on disciplinary and classification appeals. (e.g. disc. incident report appeal # 01355928; 1/14/19). He is being sued in his individual and official capacity for declaratory, injunctive, and tort relief.

12. Defendant **Tony Mays is the Warden** of Riverbend, (Since 8/24/17). He acts under color of state law, he's responsible for operating competent humane rules & procedures applicable to maintain a safe environment for prisoners, hiring adequately trained staff to positions of trust in the Department of Correction. He performs ministerial acts as Warden's disciplinary & classification review boards. (e.g. disc. incident report appeal # 01355928; 1/14/19). He must provide adequate health care & classification at Riverbend. He has authority over Hall's care & living conditions. He's being sued in his individual & official capacity for declaratory, injunctive & tort relief.

- 7 -

13. Defendant **Michael Keys is the Unit Manager** of Riverbend. He acts under color of state law, & charged with applying competent humane rules & procedures for adequate treatment and classification of death row prisoners. He has a duty to offer Mr. Hall proper care for aiding Hall in getting better living conditions. He's being sued in his individual & official capacity for declaratory, injunctive & tort relief.

14. Defendant **Warren Tate is the Unit Counselor** for death row. He acts under color of state law, and charged with applying humane rules & policies for classification & care for death row level programs. His duty is to identify, counsel & assess isolated prisoners progress using adequate treatment programs for prisoners that improve their living conditions. He's being sued in his individual & official capacity for declaratory, injunctive, & tort relief.

15. Defendant **Dr. Dina Kulenovic is a Psychiatric** Doctor for death row. She's an individual contracting agent charged with understanding humane standards for treatment & moral placement in adequate programs designed to reduce effects of isolation. Programs that restore reality, or cognitive therapy, designed to make suitable death row programs workable. Programs offering competent care to improve conditions to needy prisoners. She's being sued in her personal & official capacity for declaratory, injunctive, & tort relief.

### IV. CLAIM FOR RELIEF

16. **Riverbend's Death row** has 96 cells in 4 pods. Each Pod has 2 tiers, with 12 cells a tier. Prison customs are led by rules made by the executive branch.

Designed to circumvent the legislative checks and balance statutes for classification and conducive treatment of prisoners. TDOC/RMSI **death row policy** 503.03 now **classifies prisoners at different levels known as A, B, and C,** which fosters a denial of equal treatment and protection of the law. When a prisoner first enters death row, he or she is placed at Level C, also known as **mandatory or solitary confinement.** The classification level is reviewed the first time after **18 months.** Every month after the first reclassification, an inmates status level is reviewed **thru Unit Review Hearings** without an appeals process.

17. **Level C is more restricted** than any other form of incarceration on death row. Based on discretion factors found by the Review Panel, a level C prisoner may be moved to level B, after **18 months.** After reaching level B, a prisoner may be moved to level A after **another 12 months.** Elevated Levels grant a prisoner a few more privileges. Level A has the most privileges & offers more occasions for human contact.

18. In Mr. Hall's case, the **classification** & the **Level Review procedures** have _proved to be meaningless._ Despite several recommendations by the Review Panel that Hall be elevated to Level B status, Defendant's have arbitrarily, and without legitimate penological interest [lack of subject-matter jurisdiction, i.e. no sine quo non Tn.R.Crim.P., Rule 21(b) (affidavits by three neutral residents from Henderson County)]; have kept Hall in an indefinite state of restrictive of solitary confinement, for checking State power. **See:** (disc. incident report appeal # 01355928; 1/14/19).

- 9 -

19. **Mr. Hall** is forced to live 24 hours a day in a cell about eight foot wide, twelve feet long and eight foot tall. The cell has a concrete floor and concrete walls. There is one window that is approximately 4 inches wide and four feet high that does not open. Outside the window Mr. Hall can see part of the A-pod recreation cage, a razor wire fence, a road that enters the prison's main entrance and an airport where airplanes can take off and land in the far off distance. The cell contains a steel framed bed with a thin mattress, a small desk, a stainless steel toilet and sink and in cell shower. He has a *15 inch television; an AM/FM CD Stereo he just received 5/7/19; and a used Brother word processor received 9/1/18 (2 yrs. prior to that just a T.V.).* The door to his cell is made of solid steel & includes a food slot and a rectangular set window that looks into the pod. The air in his cell is recycled, often leaving him too hot or cold. He is **served all meals** by a guard or an inmate in no condition for a health card. I eat alone.

20. According to policy, *Mr. Hall is allowed one hour out of his cell a day* for **exercise** by himself in a small wired cage sitting on concrete. The only available C level recreation period is at 7:00 A.M. Because of an untreated or **undiagnosed back problems (arthritis).** Hall has no desire to go out of his cell on cold mornings, to walk around in small animal cage to try to out talk other prisoners with untreated mental disorders (mostly consisting of persons of another age or race). Thus, Mr. Hall rarely exploits a chance to gather with needy prisoners wanting food.

- 10 -

21. **Hall's cell** is situated on the top tier corner, enveloped by (3) [new 7/2019] Memphis prisoner's that walk around **watching everything** I do, looking for info to earn an Ace from the Hole. Its public record, RMSI has placed snitches on me (with a history of making false reports in <u>N.C. v. Thompson</u>, 420 S.E.2d 395, 399 (N.C. 1992)). <u>**REFERENCE**</u>: <u>Hall v. Mays</u> No. 10-5658, Doc. 117, page 34 n.5 of 114 filed (02/26/18) (Withheld Exculpatory Impeach Evid., TDOC snitch Chris Dutton, severely mentally ill). A C-Level (6) doors away, Mr. Huguely, keeps his pie flap down & phone on his door making "legal calls." **TDOC staff use gang members for security & discipline** (reason Keys **trained as Security Threat Group Officer;** same as past U-Mgr. Tommy Vance.) Mike Keys, under staffed operation stem from illuminati Masons, a syndicate run system called the brotherhood by Warden Tony Mays, *an informal system run by inmates.* <u>CITE</u>: Oct. 2014 *"Prison Run by Gangs."* the.atlantic.com PO Box 37565 Boone, Ia. 50037-2565.

22. **Prisoners with A-levels** are let out of their cells, advised to stay six feet from C-levels door, or told to get in their cells. Meaningful contact is hard, & access to cleaning supplies is limited. Steve West does our laundry, he has an Aug. 2019 execution date. Most **C-level clothes look dirty & slept in.**

23. **Food is substandard.** Averaging only one dish per tray as edible. **Tony Parker** told lawmakers their big budget will be supplemented by raising Commissary prices; despite the fact inmates avg. less than 0.50 ¢ (since at least 1994). RMSI Commisary raised prices on many items. Inflations hard on people low on funds.

- 11 -

24. **MONEY** is needed by indigent ℂ-levels, because they are unable to work, or trade work for items, and are desperate for basic necessities of life, for e.g *hygiene* products. Also, C-levels are honestly denied *inadequate nutrition* by prisoner's, who can't stomach the garbage they feed. Some have no type of support (except donations by others or what their attorney's can arrange for them, or they suffer in silence).

25. **The only** available programs for ℂ-<u>levels</u> *is the <u>level</u> <u>program</u>*. In other words, the group in most need of a treatment programs to better able their situation is, <u>denied</u> <u>the</u> <u>programs</u>. *A poorly conceived evaluation process,* because ℂ-levels are isolated from each other, & deprived of almost any other human contact. ℂ-levels are kept in their cells and rarely moved. Staff abuses it's power *granting only privileged inmates programs*. <u>When</u> *the needy <u>is</u> <u>held</u> <u>indefinitely</u> & <u>mistreated</u> without programs, <u>instead</u> <u>of</u> <u>treated</u>*. THE GROUND FOR BEING HELD *<u>indefinitely</u> <u>is</u>: FOR <u>TREATMENT</u>* <u>TO</u> <u>CURE</u>. (What **discretion**?) Tn. Dept. of Corrections image maxim is an *eminence front*. *Its a put on!* No truth in labeling the goal of incarceration on *Govt. made <u>human</u> <u>products</u> designed for **Tennessee** family's.*

26. There's *no available remedy* to <u>exhaust administrative remedies</u> for ℂ-levels to **review** their Level status, *<u>short</u> <u>of</u> <u>filing</u> <u>a</u> <u>lawsuit</u>*, to check & balance RMSI Staff's **abuse of its power.** Violation of 42 U.S.C. § 1997(e). <u>See</u>: "*The defects of **Total Power**".*

"*Imagine* a prison society that comprises hostile and uncooperative *inmates* ruled by force. Prisoners can be legally isolated from one another, physically abused until they cooperate, and put under constant surveillance. Although all of these things are possible, such practices would probably not be countenanced for long because *the public expects correctional institutions to be run humanely*." <u>CITED</u>: *The American System of Criminal Justice*, by George Cole & Chris Smith 10th ed. http://www.cj.wadsworth.com/colesmith10e

27. According to TDOC/RMSI policy 501.01 VI.(H)(3) ("*Classification* matters / *institutional placement* are <u>inappropriate</u> <u>to</u> <u>Grievance</u> <u>Procedure</u>."); *and* TDOC/RMSI grievance ("*A diagnosis by **medical** professionals* and medical co-pay is <u>inappropriate</u>.") Defendant's deny prisoner's an opportunity to **exercise state remedies.** Thus, any exhaustion demand is automatically waived. Torture Victim Prevention Act 1991 §2(b) 106 Stat. 73.

28. **VISITATION** for Jon Hall is rare and restrictive. Jon Hall's family is from Pennsylvania, and all live on the east coast down into Florida, so family visits are rare (one time last year on birthday). My pending appeals are past the oral arguments. Lawyer visits are basically over (except holidays). Physical contact is not allowed. Visitors if there are any, sit and stand in a cramped cubicle. Mr. Hall must talk to them through a glass window. Conversation is difficult. The height of the glass window is waist high with a shelf in front. Mr. Hall normally has to remain standing, always handcuffed to a belly waist chain and shackled.

29. ***MEDICAL CONDITION*** of Jon Hall is poor at the moment. While stressed out, Hall broke his arm in two places on June 9, 2019. Hall didn't report it until June 13, 2019, after 8 inch black & blue made it obvious it was not just sprained. The physician's assistant, Robin Hopp made a visual inspection, provided a small velcro wrist wrap with an arm sling pouch and an ABO for an extra bucket of ice daily. P.A. Robin ordered (2) 500mg Naproxen pills daily for pain & swelling. A (20) pack of Naproxen was soon provided. An in-house X-ray was done June 19, 2019.

- 13 -

30. On June 19, 2019, an X-ray machine was brought to Unit two triage, and two arm position X-rays were taken of Mr. Hall's injury. The radiologist informed Mr. Hall that Dr. Sidberry would be around on Tuesday June 25, 2019, with the results of the X-rays.

31. When June 25, 2019 rolled around, Mr. Hall was not seen by any medical personnel to discuss the results of his X-rays. While talking to Stephen Huguely, # 112195, he informed me that Dr. Sidberry had visited him that morning and prescribed him pain medication, and left the Unit. Mr. Huguely informed Hall's federal public defender's about these matters. Several oral inquiries were made to O.I.C., Sgt. Billings and Sgt. Simmons regarding the lack of an effective pain reliever, and failure to see a doctor as promised. Sgt. Simmons was around when a nurse claimed that the doctor's absence was due to the fact that their computer was down. I commented on how did this operation run before computers, and didn't they have hard copies of prisoner's records to utilize.

32. On June 27, 2019, at 8:45 A.M., I got loud with Sgt. Simmons over lack of pain medicine & medical treatment. At 10:15 A.M., I called TDOC snitchline on roll-a-round cell phone & left a complaint about Dr. Sidberry's no-show. At 11:30, A.M., RMSI nurse informs me, I have a scheduled appointment to an outside hospital to see an orthopedist. Mr. Huguely, whose always talking to the federal death row public defender's office, relayed & updated their office on the lack of progress on getting emergency health care thru RMSI staff regarding Mr. Hall's medical problems.

- 14 -

33. On July 1, 2019, Mr. Hall was finally brought two 30 pack 500mg Naproxen pills, for pain. Alleve is a similar over-the-counter medication, and considered an anti-inflammatory drug. Treating a broken arm with Naproxen for pain, is equivalent to giving him no treatment for his pain at all.

34. On July 3, 2019, Jon Hall was taken to TDOC special needs hospital down the street from RMSI, escorted by C/O Weisner. Hall had two more X-rays, and the Doctor pointed out on a cell phone with pinch zoom capabilities, two breaks on Hall right forearm at the wrist. Hall was informed that he needed surgery. But due to the fact that **25 days had passed before a diagnosis** of the break was made, *it could not be set* and *had to heal* for another 3-4 weeks before anything medically corrective could be done. Hall's hand has a diminisheded range of motion. **After being diagnosed,** Hall was given a larger reusable velcro splint and sent away with a prescription for pain medicine. Hall was placed on 5mg Loratab tablets every four hours.

35. TDOC acted with a deliberate indifference to his basic complaint of limited motion & pain, while held in mandatory isolation. Hall claims that RMSI staff had the resources & sufficient knowlege to care for a broken arm, by treating the problem diligently. Thus, magnifying the unecessary & wanton physical & mental pain by failing to promptly treat Hall's arm.

36. Mr. Hall has had mental health tests completed by MTMHI in 1995. The documented results said Hall had no significant mental health problems prior to being housed in isolation for a prolonged, indefinite time.

- 15 -

37. In Hall's case, another public record is that in 2008, MRI & PET tests were done supporting Mr. Hall's claim of organic brain damage (undisputed by the State in federal court.) It cannot be said, by the State; the right hand did not know what the left hand was doing. Demjanjuk v. Petrovsky, 10 F.3d 338, 353 (6th Cir. 1993) (disclosure obligations of relevant information). Its public record, prisons are the new mental hospitals, when Jason Toll was murdered in Unit-4, taking 10 min. on 8/7/10, during routine extraction. (Openline (615)-737-7587; a documentary on "Mentally ill behind bars" WTVF Channel 5, 8/5/14).

38. In this case, TDOC/RMSI defendant's have failed to prevent, treat, or correct isolation practices that create an unhealthy situation. Outdated prison policies on isolation, drafted by the executive department*, override the checks & balances* of the mandated statutory classification of prisoner's under T.C.A § 41-1-103 & & 41-21-202, or 18 U.S.C. § 4081.

39. An ongoing problem is, theres no executive branch appeal or remedies for the illegal, outdated level policies (ensuring only ipse dixit claims.) On May 8, 2019, Mr. Hall's re-issued an appeal personally to RMSI Level Review Defendant's. These documents given to Dr. Kulenovic for Mike Keys, still have not been addressed or returned to me by for my records. This 5/08/19 exchange is not competently dealt with by 5/21/19 Unit Panel Panel Hearing sheet. (causing frustration & clashes in never ending cycle of abuse.)

40. When Hall's mother died on 9/24/14 (Carol Hall) it took *a year to get* put on medicine for depression.

- 16 -

41. The medication was crushed & put in water in a paper cup for usage (as policy?) I might have been crazy, but I'm not a fool. Crushed medication tastes awful, & as soon as I felt emotionally stable to forego the medication; I stopped it as intolerable.

42. Jon Hall is not a child. He gets pain medicine crushed in cup of water for broken arm. Pain medicine does not taste good. But its not as bad psychotropic medicine crushed up for depression. Your Nurses, not Security nor Pharmacologists, quit playing with drugs!

43. TDOC/RMSI nurses have been known to pass out the wrong medication to prisoners, & is materially harder to identify the type of medication, when it has been crushed up, and more likely to be unsanitary.

44. The medication I receive for pain started out as Loratab every four hours. It was switched to a round Tramadol every six hours. At noon today 7/11/19, I've been given a rectangular Tramodol. Everytime they switch medications, they change dispensing times (even though its known nurses don't pass out medicine on that schedule.) The next due pill is then skipped.

45. The effectiveness of the pain medication seems to fluctuate, from nurse to nurse, application to application. It is my belief crushed pain medication is being stepped on (swapped for non-pain killer, diluted or destroyed). I have never encountered this situation on the streets, where I got a prescription, received my medication, & dispensed of as prescribed. Its my theory, its hard to know when crushed medicine has been skimmed; by nurses using medicine, like many drug dealers may practice, when they use street drugs.

- 17 -

46. It is my belief, that as prisoners of death row, that government employees or citizens of a free society, feel like were here to be abused & nobody will take our word over theirs, in these matters. **NOTE:** The movie "Rush," starring Jason Patric and Jennifer Jason Leigh, the actors gave an interview on "Made in Hollywood," about their research on how to play a Narcotics Agent. She claimed that cops believe that, "to be an effective cop; you must be willing to break the rules," telling false claims about a Narc's job (using drugs / owning a junkie's arm). Jason Patric said, "it works because nobody listens to criminals, so only people in the field know the truth. Just deny facts & nobody will question it." **OTHER:** Fox 17 News 7/15/19; @ 9:15 P.M. (Drug addicted Nurses).

47. Hall had no significant prior criminal felony history, with exception to a few minor misdemeanors. His psychological, emotional & cognitive impairments, are discussed on supra pages 5 & 6, § 8. These public records, are well known to the TDOC/RMSI Defendant's. Their prison jobs require them to view these records. As far as prisoners on death row, plaintiff's street record is probably the best on the unit. Having been a father, homeowner, high school graduate, & certified mechanic with assoc. degree in auto. tech. & management. What makes me such a threat to death row?

48. The conditions in which Mr. Hall is confined, alone, in his cell for 24 hours a day, 7 days a week, 365 days a year, exacerbates his mental condition, due to the sensory deprivation accompanying this extreme form of punishment, created by the executive branch.

- 18 -

49. The Executive Department is unconstitutionally exercising legislative power, applying implied powers of the Federal Government on classification procedures for prisoners under T.C.A. § 41-1-103; & T.C.A. § 41-21-202 or 18 U.S.C. § 4081 (classification), and is substantially slower and more agonizing to his mental health, than the punishment choosen by the jury.

50. By law under T.C.A. § 39-13-204(e)(2)(1997) calculations; Mr. Hall has already done a life sentence of 25 calendar years, on a case where the Court never ascertained subject-matter jurisdiction, or **penological justification.** <u>Carico</u> 968 SW2d 281, 286 (Tn 1998) (Life sentence 25 years). Utilizing a Henderson County territorial indictment on a Madison County Judgment (without the application of (3) affidavits from an impartial Henderson County resident). As applied to Hall, the life sentence in isolation, & ensuing brain damage from the mental torture imposed by Executive Department, is an abuse of **implied powers** & violates United States Const. Art. 1, § 10 (1) **Ex Post Facto laws.** <u>Chambers v Nasco</u> 111 S.Ct. 2123, 2132 (1991) (Implied Powers are limited); <u>State v Ray</u> 973 SW2d 246 (1997) (Exceeding authority).

51. Mr. Hall reports sleeping excessively, difficulties in thinking, an inability to focus, lack of concentration & short-term memory, stress, anxiety, tunnel vision, where his attention becomes stuck on things intensely unpleasant, irritability, depression and other mental problems associated with solitary confinement. Especially after being toyed with by RMSI staff, Defendant's on Unit Level Review Hearing Panel.

- 19 -

52. Despite having knowledge of Mr. Hall' mental health condition, Defendant's have been deliberately indifferent to the psychiatric and emotional harm caused by solitary confinement. Once a month, Mr. Hall is visited by Dr. Kulenovic, for a minute or so at his cell door. Her mental health drive-by review is done in conjunction with the monthly Unit Level Review Panel Hearing held at his cell door. Defendant's have not offered any psychological or psychiatric treatment once he refused taking the crushed up psycho tropic medication. Theres no meaningful psychiatric treatment at all. If you don't take crushed pills or meet with them at a snitch session disguised as a psychotherapy session (where information you may provide is not kept in faith.) There's no group therapy, structured educational or cognitive training, recreational, or life-skills designed to cope with reality. Thus her required drive-by reviews are a self-serving act.

53. Mr. Hall has made an A-level in past years, he lost his A-level status after he provided a urine sample in October 2013, to Cpl. Gibbs who refused it. Because he turned his head when people came through E-pod to come back from the law library. Hall was wrote-up for refusing to provide another sample within two hours, which was later dismissed by the disciplinary chair for violating due process. But that relief was an exercise in futility, as it became a moot point.

54. Moot point being, Cpl. Gibbs should not have thrown out the sample. Out of spite Cpl. Gibbs, personally served Hall anew write-up for refusing to take a test (C/o Mulberry offered to serve write-up).

- 20 -

55. When Cpl. Gibbs served the second write-up, he did so in a confrontational manner, shown as taunting. First he ordered Mr. Hall to stop what he was doing (trying to get in his cell at D-103), and to come here to get served a write-up. Hall responded, "hold on a minute let me put my stuff down in my cell, since the door lock had cycled." Cpl. Gibbs said, there's plenty of time for you to be in your cell." He opened his arms in a suggestive manner, & said: "What you going to do boy." Impulsively Hall met Cpl. Gibbs at the Ping-Pong table, and put Cpl. Gibbs in a headlock. While simultaneously stiff-arming c/o Bright's tackle.

56. When Mr. Hall received the assault write-up he reviewed it for errors, and noticed details surrounding the alleged assault write-up, could be discredited by the U-2 D-Pod surveillance camera. That would form the grounds for a dismissal.

57. Jon Hall instructed his attorney Mike Passino, to E-mail the Warden and have the surveillance video footage of U-2 D-pod on October 22, 2013 at about 4:11 P.M., preserved as evidence at his D-board hearing. Mr. Hall's defense on the assault write-up, was straight forward pleading requirement of true facts. Blackmon v. Wilson 709 SW2d 596, 602 (Tn.App. 1986)

58. On Nov. 11, 2013, Disciplinary Chair, Sgt. Curry, denied Hall a right to review & rely upon the said 11/22/13 videotape. The tape shows Gibbs taunted Hall & prove Cpl. Gibbs was lying about a fist-fight. Then with deliberate indifference to Hall, he was found guilty. This was upheld on appeal on suppressed evidence. Gibbs was later fired for reasons unknown.

- 21 -

59. This assault write-up (Incident ID # 1052852), occurred just prior to the *April 25, 2014 news story* broke in regards to *TDOC falsifying records on staff assaults, by WSMV* News Channel Four (4) at 10:10 P.M. central standard time.

60. Based upon Hall's personal knowledge of the Executive Department's (TDOC/RMSI) practice utilizing unwritten arbitrary policies; has caused Mr. Hall's poor outlook on prison life; has induced him to speak out at the Defendant's psychopathic Unit Review Panel.

61. The Defendant's arbitrary exercise of power and flawed due process, by these instigators taunting him, coupled with the detrimental effects of prolonged isolation, has caused Mr. Hall to lash out at these extreme frustrations and feelings of hopelessness.

62. Mr. Hall's personal knowledge of TDOC/RMSI defendant's refusal to grant Mr. Huguely's an elevated level, after he has complied with all the rules and regulations of the disciplinary policy for four years (only tangible set standard of conduct on level review) establishes that under RMSI conditions (**no treatment**); it's not a delusion of inequity. But a proven fact, fueling a fire of contempt toward the **gratuitous adverse treatment** applied without regard to the only expressed policy ground (time), focused on by staff in my case, as an excuse for their **mistreatment**.

63. Jon Hall relies upon a more recent disciplinary incident to legally support his allegations of inequity in the procedural due process, affecting the level review. <u>See</u>: *EXHIBIT [1]* Commissioner's & Warden Appeal, 27 pg. (Incident #01355928), Received 1/11/19.

- 22 -

64. Plaintiff's ~~enclosed~~ *EXHIBIT [1]*, is a combined Warden & Commissioner appeal, stems from a disciplinary incident # 01355928 that was set in motion on October 30, 2018, by Unit Manager / Defendant Michael Keys, direction to conduct a cell search on Mr. Hall's cell on Unit two, A-Pod, A-207. During the search, Cpl. Mazon claimed to have found (3) items he considered as contraband, listed on the face of the write-up; i.e. (1) broken television parts; (2) a homemade bong; & (3) a substance that tested positive for heroine. **NOTE:** RMSI Defendant's know Hall <u>did</u> <u>have</u> **heroine**; but let charges stand!

As shown on supra page 21, § 58, last sentence, Cpl. Mazon quit or was fired for unknown reasons, shortly after testifying against Hall. Based on information & belief, anyone that does not agree with executive syndicate, is retaliated against by off the record discretionary decisions.

65. To make a long story short, at the Disciplinary Hearing on November 26, 2018; Disciplinary Chairperson, Sgt. Dee Scott, without adequate notice or authority, <u>amended the gist</u> of the write-up <u>to find Hall guilty</u> of the contraband write-up, using <u>irrelevant extrinsic evidence</u> that was not personally tested, nor meet the quasi judicial standards under Tennessee Rules of Evidence, Rules 402, 601 & 602. <u>Deloit</u>. 964 SW2d @ 912 (Tn. 1997) (Quasi-settings / Rules / Validity). Because <u>evidence</u> to support Sgt. <u>Scott's opinion</u>, was <u>not stated in the</u> <u>write-up</u>. Defendant's failed to dismiss write-up under TDOC Policy 502.01, § VI., f. 1 (dismissal - errors).

- 23 -

66. On appeal on 12/11/18 (writ of certiorari), Warden Mays, the Defendant, found: "*Items* were discovered and recovered from your cell on October 30, 2018 by Corporal Mazon. *Conviction of case Affirmed.*

67. On appeal on 1/14/19, Defendant / Commissioner found: "Upon reviewing your disciplinary appeal & documentation, the infractions for which an inmate of TDOC may be disciplined and/or criminally charged are outlined in TDOC Policy 502.05. You have failed to support your claims the Warden reached an incorrect decision when reviewing your original appeal. *The charge of contraband is affirmed." Appeal is denied.*

68. What is obviously not addressed in this appeal, is the ultimate **penological interest**, brought up in this disciplinary; i.e. the lack of subject-matter jurisdiction over Hall's criminal case, as presented in **(WAR)** Warden Appeal Record, pages 12-18. The gist of the attached State Habeas Corpus petition, was to notify the Warden, the Madison County Judgment, is based on a **nul tiel record**, missing the **sine quo non** of Tn.R.Crim. P. 21 (b) or TCA § 20-4-203 (Affidavits) by (3) disinterested residents of Henderson Co., averring that a fair trial could not be had in Henderson Co., Tennessee.) The basis for the State's **bogus penological interest** in imprisoning Hall, save isolation matters. **See Exhibit [2]** (1/15/19 Motion For Summary Judgment / Fraud Upon Court; & (7) Exhibits.

69. The prompting of disciplinary infractions that originally took Mr. Hall's level & has kept him segregated for over (5) ½ years so far (discussed on supra page 20-22, §§ 53-62), are examples of a pretext

- 24 -

for RMSI creating a situation to take a person's level. In short, staff's utilization of *daycare rules* is nothing more than a sham & pretext to continue isolating Hall without legitimate cause. TDOC/RMSI staff knows prisoner's sentenced to death row, do not have many serious violence incidents, while confined under any level in general population conditions.

70. If you learn more about the history of death row. You will find out some death row inmates, utilize the bogus disciplinary system as a guise to take down their enemies. A bogus assault game (swing at someone outside of camera range, and the fights on). Then the perpatrator moves back in camera range; he plays duck and cover. The camera shows only the defender as the aggressor, and only he looses his level.

71. One *spoiler* that works for RMSI staff, will call him *Zipper Neck*. He got involved into another persons visitor's business, & when word got back from the guy who Zipper Neck was running game on; Henry Hodge opened up Zipper Neck's throat with a razor. Zipper neck has the protection of staff, & continues to roll in games with staff approval, with impunity; (or less hole time than others with similar offenses.) Hodge has never made a level in 22 years I've been on death row. He's suffered the most adverse unecessary & wanton neglect, deprivals, & mistreatment I've seen on death row. It's a miracle he's not committed suicide.

72. The only other comparable serious violence that occurred, on death row since my 2/5/97 death sentence; comprised of (3) inmates, Gary Sutton # 218364, Derrick Quintero # 165463, & Michael Howell # 131503.

- 25-

73. According to rumor, it started over a female guard (C/0 Pendleton - mule); when Howell attacked Quintero, at the Arts & Crafts program. Sutton picked up a leather hammer & stopped the attempted simple assault, that resulted in the first aggressor having to deal with about 65 stitches on Howell's Head.

74. While Mr. Howell was alive (deceased 12/18/13), all three individuals involved have been granted a level. Quintero & Sutton are currently still A-levels.

75. Thus, safety & security concerns for other inmates, does not appear to be as a clear cut interest model towards discretionary security across the board as an affirmative penological justification defense. In other words, the main characteristic appears to be more arbitrary & conditioned upon, only who's Head is on the line for consideration in a given situation.

76. Mr. Hall has no meaningful procedural ability to present any rebuttal to the Defendant's decisions or other procedural safeguards to prevent such arbitrary decisions, short of filing this lawsuit. He has unsuccessfully submitted grievances, disciplinary appeals, and classification or level appeals, all to no avail, where legitimate consideration was made. Level appeal attempts, go unanswered by Defendant Mike Keys, even after a second level appeal was provided to the RMSI Unit Panel Review Board (as discussed on supra page 16, § 39).

77. Hall's had oral arguments in the Sixth Circuit Court of Appeals in January 2019, & waits on a decision. Theres no tangible review process available to Mr. Hall, other than presented to this Court.

- 26 -

78. Mr. Hall has a significant interest in leaving these restrictive conditions and living life on the streets. Based on pre-trial brain check of Mr. Hall's brain, indicating negative results on brain damage performed in 1995; & post-trial studies of Hall's brain in 2008, done by Dr. Gur, a Neuropsychologist at the University of Pennsylvania; suggest Hall suffered severe brain damage during 13 years of incarceration (discussed on supra pages 5 & 6 § 8; public record). Mr. Hall has no serious violent offenses making him a threat on death row! Form cause to wonder; how Hall did 30 of 55 years on street without much trouble?

79. Mr. Hall has been held in very restrictive conditions of confinement for about 18 years of the 25 years, during his tenure in TDOC/RMSI custody. Mr. Hall's prolonged and indefinite solitary confinement, presents an atypical and significant hardship in relation to other prisoners on death row, who are able to have contact visits, time outside their cells, participation in activities, and human contact.

80. In this case, incarceration for violating insignificant daycare rules, exhibit points forming state crime. Where RMSI staff acts of taunting, are directed toward a mentally defective prisoner, due to a personal hatred of him; or an attempt to "break" Mr. Hall with insignificant daycare rules. To discredit and suppress practice of grieving State misconduct. No matter what the reason, it's clear that TDOC/RMSI correction methods have been an overt exertion of governmental power and a futile exercise in stifling Mr. Hall from making many government practices known.

- 27 -

81. Defendant's decision to keep Hall in an indefinitely prolonged or permanent state of mandatory solitary confinement inflicts, and will continue to inflict, great mental suffering as well as physical distress upon Mr. Hall. The promises of good things to come made to fellow prisoner (Huguely # 112195 within earshot) and then the Defendant's refusal to consider the Unit Review Panels recommendations or any other feasible alternatives to his current living conditions, (after he remained disciplinary free) constitutes a de facto form of psychological torture, where other prisoners are made examples of, demonstrating that nobody really has anything coming, in spite of known policy concerns being ignored, constitutes a form of psychological torture that amounts to intentional & gratuitous infliction of cruel and unusual punishment (without a procedure to redress); illustrates a demonstration of total dominance over another, without any checks & balances for all those similarly situated.

82. The deprivation of humane conditions of confinement in Mr. Hall's case is objectively, sufficiently serious to violate the Eighth Amendment's prohibition against the infliction of cruel and unusual punishments. Courts have long recognized the serious adverse consequences to an inmate's health caused by prolonged detention in solitary confinement. *See, e.g. In re Medley,* 134 U.S. 160, 168 (1890); *Ruiz v. Texas,* 137 S.Ct. 1246, 1247 (2017) (Breyer J., dissenting from denial of stay of execution) (stating that evidence demonstrated that the petitioner, an

- 28 -

inmate held on Texas death row, "ha[d] developed symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty"); *Glossip v. Gross,* 135 S.Ct. 2726, 2765 (2015) (Breyer J., dissenting) (reviewing literature and stating that "it is well documented that ... prolonged solitary confinement produces numerous deleterious harms"); Davis v. Ayala, 135 S.Ct. 2187, 2210(2015) (Kennedy, J., concurring) ("[R]esearch still confirms what this Court suggested over a century ago: Years on end of near total isolation exact a terrible price.").

83. The Fourth Circuit Court of Appeals recently found that "[p]rolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized." *Incumaa v. Stirling,* 791 F.3d 517, 534 (4th Cir. 2015). The Third Circuit recently reviewed the "robust body of scientific research on the effects of solitary confinement "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at long-term damage." *William v. Sec'y Penn. Dept. of Corr.,* 848 F.3d 549, 566-67 (3d Cir. 2017), cert. denied sub nom. *Walker v. Farnam,* 138 S.Ct. 357 (2017), and cert. denied sub nom. *Williams v. Wetzel,* 138 S.Ct. 357 (2017); see also, e.g. Grissom v. Roberts, 902 F.3d 1162, 1176-77 (10th Cir. 2018) (Lucero, J., concurring) (reviewing academic literature and determining that "solitary confinement, even over relatively short periods,

renders prisoners physically sick and mentally ill...
These harms, which are persistent and may become
permanent, becomes more severe the longer a person is
exposed to solitary confinement.")

84. A number of courts have found -- based on
empirical evidence -- that solitary confinement poses
an objective risk of serious psychological and
emotional harm to inmates, and therefore can violate
the Eighth Amendment. See, e.g., *palakovic v. Wetzel*
854 F.3d 209, 225-26 (3d Cir. 2017) ("acknowledg[ing]
the robust body of legal and scientific authority
recognizing the devastating mental health consequences
caused by long-term isolation in solitary
confinement"); *Ashker v. Brown*, No. c 09-5796, 2013 WL
1435148, at *4-5 (N.D. Cal. Apr. 9, 2013) *Wilkerson v.
Stadler*, 639 F.Supp.2d 654, 678-79 (M.D. La. 2007)
("it is obvious that being housed in isolation in a
tiny cell for 23 hours day for over three decades
results in serious deprivations of basic human
needs."); *McClary v. Kelly*, 4 F.Supp.2d 195, 208
(W.D.N.Y. 1998) ("[T]hat prolonged isolation from
social and environmental stimulation increase the risk
of developing mental illness does not strike this
Court as rocket science.").

85. Most recently, the Fourth Circuit Court of
Appeals found "the challenged conditions of
confinement on Virginia's death row -- under which
inmates spent, four years, between 23 and 24 hours a
day alone, in a small ... cell with no access to
congregate religious, educational, or social
programming pose a substantial risk of serious

- 30 -

psychological and emotional harm." See *Porter v. Clarke*, No. 18-6257, 2019 U.S. App. LEXIS 13398 (4th Cir. May 3, 2019) (internal quotations omitted).

86. The conditions of Mr. Hall's ***prolonged and indeterminite segregation*** impose an atypical and significant hardship on Mr. Hall compared to the less restrictive conditions Defendant's impose on other death row prisoners. The severity of the conditions are *not in furtherance of* **legitimate penological interests,** <u>knowing</u> that the **Madison County judgment** records are **void** of the **sine quo non** of **jurisdictional facts** to support judgment, in a death penalty case, as ·mandated by T.C.A. § 40-13-210; T.C.A. § 20-4-203; T.C.A. § 20-4-209; and T.R.A.P., Rule 13 (b); and T.C.A. § 39-11-103 (a); T.C.A. § 39-11-201(e); depriving Madison County, Tennessee **subject-matter jurisdiction** of Henderson Co, Tennessee **territorial indictment**. T.C.A. § 39-11-103(a); & 18 U.S.C. § 3235.

87. Neither the Court, nor Hall's attorney's had the **ostensible authority to change venues** *over Hall's pre-trial objection*; and subsequent direction to appeal. *Trial Trans. of Evid., Vol. 1, pages 7-8 Hall's pre-trial objection T.C.A. § 20-4-105 & T.C.A. § 40-35-214 (c);* and Trial Technical Record, Vol. 2, Pages 152, 188-89, & 200-201 (appeal directions; RE: subject-matter jurisdiction); and March 20, 1997 (Motion For New Trial / Motion To withdraw, Page 20). The records show, that Mr. Hall did not mutually consent to any proceedings held in Madison County. *McCoy v. Louisiana*, 584 U.S. __ (2018) (autonomy: competent to dirct objectives of defense) after being

- 31 -

duly notified and properly informed by direct due process channels. It cannot be said that a joint enterprise existed within the meaning of the law of agency, and the law of imputed negligence. Where the objects of the legal right to direct and govern effective assistance of counsel, were not served with respect to the parties thereto; (where the court denied Hall an **opportunity** to have a **voice** or **right to be heard** in its **control and management.**) _Fain v. McConnel_, 909 SW.2d 790, 792 (Tn. 1995). The court is responsible for every aspect of the trial. _State v. Gibson_, 973 S.W.2d 231, 245 (1997).

88. Mr. Hall put Defendant's on notice of his trial & isolation issues, through oral complaints, lawsuits, grievances, denying override on classification, by not signing name on documents, to filing everything truthful imaginable to make the Defendant's stop, listen, & correct this egregious situation, _all to no avail._ Further, Hall has _personal knowledge_ that Plaintiff, Stephen Huguely has received documents with the above listed court cases referenced above with ample scholarly literature showing & quantifying mental health effects of extended solitary confinement that gave defendants actual notice of risk of serious & material harm. _Huguely v. Tony Parker_, 3:11-cv-01115, Doc. 30-2, (6/5/19) PageID# 354-380 (similarly situated as Hall). See e.g. cites & statements in "Brief of Amici Curiae Professors & Practitioners of Psychiatry Supporting Plaintiffs-Appellees Affirmance" in _Porter v. Clarke 2019 U.S. App. LEXIS 13398. A copy of the Amici Curiae Brief, attached as **Exhibit [3]**.

- 32 -

Proposed Exhibit
Not Provided 7/30/19
(Top large) for

89. The risks associated with being forced to live in a very small concrete and steel area, in restrictive conditions of isolation, since September 1994 as a safekeep prisoner; and beginning on February 5, 1997 as a death row prisoner, for almost 25 years are so obvious that no reasonable person can claim to be unaware of them.

90. Defendants have been aware of and deliberately indifferent to the harms and risks of severe mental pain and suffering caused by Mr. Hall's long-term mandatory segregation. Despite this knowledge, Defendant's have held Mr. Hall in mandatory segregation without penological purpose. Defendants knew or reasonably should have known that their actions would violate the constitutional rights of Jon Hall, *on a _erroneous_ _TDOC_ _file_ tagged John Hall.*

91. When Mr. Hall questions why he remains in mandatory segregation, and the board ignores the sentencing procedures pursuant to T.C.A. § 40-35-102 (2); and T.C.A. § 40-35-102 (4) or (federal 18 U.S.C. § 4081); that place him in a minimum custody range; and the Unit Review Recommends, Mr. Hall's Level status be elevated; Defendant's *rely mainly upon the basis of a clock*, or a _minor_ disciplinary _write-up_ _infraction_, to deny him relief (that may or may not have been given meaningful due process consideration; *_without_ penological justification*), e.g. considering the subject-matter jurisdiction of a Henderson County Indictment (Trial Tech. Record, Vol. 1, pages 1-4), with a Madison County Judgment Form (Trial Tech. Record, Vol. 2, pages 179.)

- 33 -

92. Defendant's refusal to grade & classify him, or newly sentenced death row prisoners under the statutory mandated procedures provided by T.C.A. § 41-21-202, (Grading & Classifying Prisoners) deny him a liberty interest to be classified: "in such a manner most conducive to prison discipline and the moral status of the prisoner." Thus, denying death row prisoners fair and consistent treatment provided to the entire prison population (excluding RMSI death row). Meant to respect race, gender, & social status.

93. There is no valid or subsisting reason for holding a newly sentenced inmate in segregation (where a prisoner is held in segregation for a prolonged or indefinite period of time.)

94. There is no valid or existing reason to hold a punished inmate in punitive segregation (for prolonged or indefinite period of time.) Due process directs that a situation should be reviewed periodically in a meaningful way by relevant standards to determine whether he should be retained in segregation. Kelly v Brewer 525 F.2d 394, 400 (CA 8 1975); Hewitt v Helms 459 U.S. 460, 491 n. 19 103 S.Ct. 864 (1983).

95. According to Eff. Date 12/1/14 TDOC/RMSI Policy 502.01 § VI., L., 5., a., (7); (Pg. 17 of 36) (Uniform Disciplinary Proc.), offers in-part: "Up to 30 days **punitive segregation** may be imposed for each separate offense where inmate is found guilty. Continuous confinement exceeding (30) days must be reviewed & approved by Warden & Commissioner's designee at privately managed facilities. No period of confinement may exceed 60 days for punitive segregation." * * *

- 34 -

96. Mandatory segregation is not mentioned by statute in terms of Hall's original bogus criminal conviction & sentence. Hewitt, supra at 487. This power is governed by TDOC/RMSI Policy 503.03; under T.C.A. § 4-3-603, §§ 4-3-606; & T.C.A. § 41-24-110. An *inherent power* granted to the *President*, that is not necessary *for the* ***State to function***. It is derived from a legislative act, *that improvidently delegated* authority to Executive Dep't. a ***POWER DENIED TO THE STATE***. U.S. Const. Art. 1, § 10; & ***granted only to the President***, by U.S. Const. Art. 2 § 2 (Federalism).

97. Plaintiff Jon Hall, grieves the misapplication of Executive Dep't. policies, in collusion with our State's Legislative Branch, & the judiciary. That unlawfully apply **civil** equity powers to deny Plaintiff Hall, a (United States citizen) of his due process & equal protection of the Supreme Laws of the land, *in a* ***criminal matter*** (before & after his bogus conviction). Chambers v. Nasco, 501 U.S. 32, 42-43, 111 S.CT. 2123, 2131-32 (1991) (*Inherent power*, "is not a broad reservoir of power, ready at an imperial hand, but a **limited source**; an *implied power* squeezed from the need *to make a court function*.") A custom of pretend legislation by figment of unwritten policies or **civil laws** on the fly; to breath life into facially void laws & proceedings under the *discretionary* **implied powers** (using ***President's War Powers***), violated Hall's 1st, 4th, 5th, 6th, 8th, 9th, 10th, 13th & 14th Amend. U.S.C.A. Chambers 501 U.S. @ 59-60, 111 S.Ct. @ 2140-41 (1991) (Congress may specify some degree how ***constitutionally set Presidential power*** can be used.)

- 35 -

98. Plaintiff Jon Hall grieves the illegal use of ***bills of attainder's and ex post facto CIVIL laws*** being applied <u>to</u> <u>his</u> <u>detriment,</u> (in his criminal case). <u>Hall v Bell</u> 1:05-cv-01199-JDB-egb, Doc. 110, PageID1352 (4/14/10) (arise under 18 U.S.C. § 3235). Applied by the State of Tennessee for cruel & unusual punishments, i.e. prison classification override). <u>Chambers</u> 501 U.S. @ 74, 111 Sct. @ 2148 (1991) (By ***exercising inherent power*** <u>where</u> <u>Congress</u> <u>gave</u> <u>it</u> <u>none</u>. * * * occurred in a **<u>diversity</u> <u>case</u>** & ***compounds error***.)

In a similar circumstance regarding implementation of a punishment under a new law (or policy 404.11-1 or 503.03); was so substantially more burdensome than the punishment imposed by the jury, under the statutory law, as to render its application to Mr. Hall (plaintiff's), as to render its application to him ex post facto. *In re Medley*, 134 U.S. 160, 162 (1890). The Supreme Court agreed with him, even though it simultaneously recognized that if Mr. Medley was not sentenced under the new law, he could not be sentenced at all. <u>Id</u>. at 166. Despite that, this court held that this additional punishment of one month of solitary confinement was too egregious to ignore; the court declared Mr. Medley a free man, and ordered his release from prison. <u>Id</u>. at 174.

99. Plaintiff Jon Hall grieves the State's illegal termination of his parental rights, (of his United States natural born children, as grieved in  in Hall's Carroll County Case; and the useless State habeas corpus action). Producing inconceivable mental torture over loss of daughter's Stephanie & Jessica's  loving

- 36 -

touch. The State aided in merit of the termination action & added loneliness caused from it. Hall's current & ongoing mental decline without penological interest is a primary cause of the irreparable damage.

100. Defendant, Donald Trump, is the leader of the free world, and as such responsible under the **Respondent Superior** doctrine. According to his oath, he shall take care the laws of the United States shall be executed. Thus, he acts under color of Federal Law. He is being sued in his official capacity.

101. In this manner, the gist of Hall's complaint he grieves; when Government agents utilize **only** the "*Presidents*" **assigned War Power** to suspend the written laws. To apply questionable policies that should not be made; to deny Due Process and Equal Protection of the Law. He must take care to execute the laws and shut power mongers down. To prevent partisan politics; from taking hold and establishing **bad law** & breath life into void cases; (game rogue bureaucrats play, when they usurp the President's Federal War Powers to support their cause.)

102. In this matter, Hall has pointed out several instances where Government agents for the State of Tennessee, have unlawfully applied Federal **inherent or implied** War Power *(assigned only to the* "*President*.")* To make unjust laws that suspend persons / citizens State & Federal Constitutional Rights, (as an abusive power grab, by misconstruing the laws of the Constitution, to defraud the U.S. Constitution). By applying a custom or policy of unwritten laws, which are a clear violation of the Ninth & Tenth Amendments.

- 37 -

103. Defendant, Bill Lee, is the leader of the State of Tennessee, charged under the **Respondent Superior** doctrine. According to his oath, Bill Lee, shall take care the laws of the State of Tennessee shall be enforced. Thus, he acts under color of State Law. He's being sued in his official capacity.

104. In this manner, the gist of Hall's complaint, he grieves; when Government agents of the State utilizing **War Power assigned** to the President, that suspend the written laws. To apply questionable policies that should not be made; to deny Due Process and Equal Protection of the Law. The Governor must take care to carry out laws of the State and shut down power mongers. To prevent partisan politics; from taking hold and establishing **bad law** that breath life into void cases; (game where rogue bureaucrats often play, when they usurp the President's Federal War Powers to support their cause.)

105. In this matter, Hall has pointed out several instances where Government agents for the State of Tennessee, have unlawfully applied the "_**Presidents**_" Federal **inherent or implied** War Powers. To make unjust laws that suspend persons / citizens State & Federal Constitutional Rights, (as an abusive power grab, by misconstruing the laws of the Constitution, to defraud the U.S. Constitution). By applying a custom or policy of unwritten laws, which are an obvious violation of the Ninth and Tenth Amendments.

### V. CAUSES OF ACTION
### COUNT 1: 8TH & 14TH AMENDMENTS
### (CRUEL AND UNUSUAL PUNISHMENT)

- 38 -

106. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

107. By their policies and practices described herein, Defendant's have deprived and continue to deprive Mr. Hall of the minimal civilized measure of life's necessities, and have violated his basic human dignity and his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution for each of the reasons set forth below.

108. First, a cumulative effect of severe extended solitary confinement, along with the deprivation of good medical & mental health care, & other harsh conditions of Mr. Hall's isolation amount to a serious deprivation of at least one basic human needs, including but not limited to common contact, positions & sensory loss, mental & physical health, physical exercise, sleep, nutrition, & meaningful activity.

109. Second, undue prolong exposure to denial of basic needs is currently causing severe mental pain & & permanent psychological & physical harm on Hall.

110. In addition to his current psychological and physical pain, the likelihood that Mr. Hall will remain in solitary confinement for the foreseeable future subjects him to a significant risk of future incapacity & permanent mental illness & physical harm.

111. Third, Defendants' actions, individually and collectively, ensuring Mr. Hall's stays isolation are not rightfully related to security or other penological needs of isolating an alleged dangerous

- 39 -

prisoner, but rather are an arbitrary exercise of power, from a denial of a fair & reasonable process.

112. Finally, Defendant's enduring confinement of Mr. Hall for $5\frac{1}{2}$ straight years and many others on top of that under debilitating and extreme conditions strips him of his basic dignity and humanity in violation of contemporary standards of human decency and constitutes cruel and unusual treatment prohibited by the 8th and 14th Amendments U.S.C.A.

113. The policies and practices complained of herein have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their individual & official capacities.

114. Defendants have been aware of the deprivations complained herein, and condoned or been deliberately indifferent to such conduct. President Donald Trump's agents illegally bargain under 22 U.S.C. § 454, & 10 U.S.C. § 4594; misusing his civil power; and Tennessee Governor Bill Lee, civil powers under Tn. Const, Art. 1, § 25 (violating 9th Amend. in criminal cases). They are being sued under official capacity only, as Respondent Superior. Its not alleged these leaders are involved, but acts occur within their power & control.

115. It should be obvious to Defendants and to any reasonable person that conditions imposed on him for years cause notable mental anguish, suffering, & pain. Moreover, staff is keenly aware, via administrative channels & written or oral complaints when Hall's harmed. Defendants been deliberately indifferent to urgent medical care (broke arm) & mental health needs.

- 40 -

## COUNT II: FOURTEENTH AMENDMENT

116. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

117. Defendant's have deprived Mr. Hall of a liberty interest without due process of law by denying him meaningful and timely periodic review of his continued long-term and definite commitment to solitary confinement, by denying him meaningful notice of what he can do to free himself of these extreme restrictions and by denying him rights to appeal the Warden's arbitrary decision, in violation of the 14th Amendment to the United States Constitution.

118. The conditions and the duration of Defendants' confinement of Mr. Hall constitute an atypical and significant hardship as compared with the ordinary incidents of prison life on death row for three basic reasons: (a) the exceedingly harsh and isolated conditions of solitary confinement; (b) the lengthy duration of solitary confinement; and (c) the cumulative adverse physical and psychological effects that result from such confinement.

117. Mr. Hall has been held in the extreme conditions described above for many years. Upon information and belief, this extended commitment to solitary confinement is atypical in comparison to the ordinary disciplinary and administrative segregation imposed in Tennessee on death row or otherwise.

118. Because indefinite commitment to solitary confinement constitutes a significant and atypical hardship, Mr. Hall is entitled to meaningful notice of

- 41 -

how he might alter his condition and gain adequate relief, as well as meaningful and timely periodic reviews and appeals (with the aid of counsel) to determine whether his situation truly warrants a madison Co conviction & sentence done in isolation.

119. Defendants have denied and continue to deny any such notice or meaningful review by: (1) failing to provide Mr. Hall with notice of what he can do to get relief from the conditions of his solitary confinement: (3) making a predetermination that Plaintiff will stay in solitary confinement until he dies; and (4) failing to provide a meaningful appeal of these decisions, thus rendering the Level classification system and the periodic reviews he receives substantively and procedurally meaningless.

120. Defendants also violate Mr. Hall's due process rights by retaining him in conditions that amount to atypical and significant hardship without legitimate penological interest, (put up sine quo non T.C.A. § 20-4-203 T.C.A. § 20-4-209 (3 affidavits showing subject matter of territorial jurisdiction with hearing transcripts, on nul tiel record) as this detention occurs without reliable evidence that providing relief from the harsh conditions of solitary confinement will present a danger to the safety and security of other prisoners or prison staff.

## VI. <u>PRAYER FOR RELIEF</u>

121. Plaintiff has no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Mr. Hall has suffered and will continue to suffer irreparable injury as a result of unlawful

acts, omissions, policies, and practices of defendants, as alleged herein, unless he is granted the relief he requests. The need for relief is critical because the rights at issue are paramount under the United States Constitution.

WHEREFORE, Plaintiff requests this Court grant him the following relief:

a. Declare that Defendants' policies and practices of committing Plaintiff to prolonged and indefinate solitary confinement under the conditions set forth in his Initial Pro-Se Unamended Civil Rights Complaint, violates the 8th & 14th Amendments. U.S.C.A.

b. Issue injunctive relief ordering Defendants to present a plan to the Court within 30 days of the issuance of the Court's order providing for:

i. alleviation of the conditions of Plaintiff's confinement so that, for example, Plaintiff is allowed contact visitation with family, friends and legal counsel; family and friends can purchase food from vending machines at the prison like other death row visitors; Plaintiff is no longer incarcerated on a void Madison Co. judgment bill of attainder, and no longer sentenced or punished on a void Madison Co. judgment, and no longer sentenced or punished in isolation on ex post facto laws (for more than 60 days); sensory deprivation, enviornmental deprivation, and lack social and physical human contact.

ii. meaningful review and rights to appeal decisions regarding the continued need for Plaintiff's solitary confinement within 45 days of the date of the Court's order;

iii. meaningful review of Plaintiff's confinement level in the future; and

iv. adequate medical care to the Plaintiff to provide relief from chronic pain, treatment of his healthcare issues and the provision of adequate mental health treatment.

c. Exercise the Court's discretion to provide funds, either through the funds available to this court or through combination with the Federal Public Defebnder's Office for the Middle District of Tennessee, so that Mr. Hall can engage appropriate experts, including a psychiatrist and physician;

d. Award Plaintiff compensatory and punative damages in amounts determined appropriate at trial;

e. Award the costs of this suit and reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

f. Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court; and

g. Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Jon D. Hall # 238941
R.M.S.I. U-2-A-207
7475 Cockrill Bend Blvd.
Nashville, Tenn. 37209

- 44 -

## VII. <u>MISCELLANEOUS COMPLEX MATTERS PROPOSAL</u>

The, plaintiff requests that this Court perform a complete review of his pro se complaints. I am aware that a prudent Court may rely on pleadings <u>Franklin</u>, 745 F.2d 1221, 1228 (1984) (Court's own records used to construe claims properly); and <u>Church</u>, 987 S.W.2d 855 (Tn. 1998) (Court's will take notice of records & actions in a party's earlier attacks of conviction.)

After a complete review by an impartial court. Hall believes that this Court will find his assessment of claims, that State actors misconstrued their own law. Providing this Court with a viable opportunity to grant an appropriate writ (similar to writ of habeas corpus, for lack of presumption of correctness under T.C.A. § 40-35-401(d), T.C.A. § 40-35-402(d): or 28 U.S.C. § 2254(d)). **Performed for legal purpose,** *to decide legality of the State's interest* in a claim on *"whether Hall's prison conditions are constitutional with legitimate penological justifications."* See e.g. <u>Porter v. Clarke</u>, 923 F.3d 348, 362 (U.S.C.A. 4th Cir. 2019) ("<u>prison</u> <u>conditions</u> <u>are</u> <u>unconstitutional,</u> <u>if</u> *they constitute an* **'unnecessary & wanton'** **infliction of pain are ones <u>without</u> <u>penological</u> <u>justification</u>.'")** In support of this claim, the plaintiff states:

1. *Prior reviewing court's* **failed to perform** there **duty** by failing to make sure the trial record showed that a competent court had **subject-matter jurisdiction** over a Henderson County territorial indictment to try an accused in a capital case. Tennessee Courts, have

- 45 -

disregarded the fundamental rules directed at **criminal proceedings** demanded by Tn.R.Crim.P., Rule 1(e), 18(a), 21 (b) & (f), 23 & 43. Without having the actual Tn.R.Crim.P. Rule 21 records (T.C.A. § 20-4-203 & § 20-4-209; venue change affidavits or venue hearing transcripts); for a competent court to make a change of venue. An original court loses it power to try anyone outside the territory where indictment is laid.

2. In this case, in order to achieve the conclusions found by the trial and subsequent reviewing courts, they had to **misapply a** <u>civil</u> **/** **special** <u>limited</u> **or equity procedure,** *which* <u>*exceeded*</u> *<u>a</u>* <u>*criminal*</u> <u>*courts*</u> <u>*jurisdiction*</u> (War court: 9th Amend.) Missing the point, that a ***competent criminal court*** <u>must</u> have the *records to prove it had obeyed all statutory condition precedents* to maintain the Courts **subject-matter jurisdiction** (T.R.A.P., 13(b) & (e) once case is moved in another territorial jurisdiction) demanded by T.C.A § 40-13-210 (Jurisdiction to support alleged judgment)

3. In this light, a trial technical record would have to show any court experts reviewing an appeal, <u>must</u> be able to verify records or evidence offered in a Capital Case, & <u>must</u> meet rigors of Tn.R.Evid. Rules 703 & 901(a) to merit **presumption of validity.** <u>Deloit</u> 964 SW2d @ 913 (Tn 1997) (presumption of validity; TCA § 40-35-401(d), § 40-35-402(d) & 28 U.S.C. § 2254(d)).

4. Hall's trial record shows, over his own pretrial objection (Tr.Trans. V. 1, P. 7-8; T.C.A § 20-4-105); the steps used did not obey basic due process demands of notice & opportunity to be heard at a meaningful time in a meaningful way. Hall's trial record is void.

- 46 -

5. Hall's trial record shows, that reviewing Courts disregarded the Rules of Strict construction demanded in criminal cases. **In short,** the venue was changed without fair due process notice to Hall personally, and not done in a meaningful way (without hearing while Hall was being held at RMSI as a pretrial safekeep), and done in a **summary manner,** without affidavits or a hearing **by ignoring the written law.** (<u>See</u>: Tn.R.Evid. Rule 901(a) condition precedents; to support facts) Then, the Courts' applied off point judge made law in <u>Nichols</u> 877 SW2d 722, 728 (Tn. 1994) (Motion w/o affidavit equal waiver); breaching T.C.A. § 16-3-403 (Rules not to affect substantive rights).

6. These acts illegally **shifted burden of proof,** to **prove prejudice,** in spite of 18 U.S.C. § 3235**,** in Federal Court, where Judge Breen did not apply State law, arising under & ignored outcome test. Instead he relied on **improper federal judge made law.** *<u>Williams v. U.S</u>.,* 582 F.2d 1039, 1041-42 (6th Cir. 1978). <u>CITED</u>: <u>Hall v. Bell</u>, 1:05-cv-01199-JDB-egb, Doc. 110 PageID 1352, n. 10 (4/14/10); & Doc. 122, PageID 1573 (06/04/10). **Both Federal reviews** ignored *pro-se bad faith & prejudice claims*, in <u>Hall v. State</u> 2005 WL 22951 (Tn.Cr.1/5/05)[Post-Con.Rec., Vol. 8, Pg. 1026-27) (Pro-se: venue *prejudice: denied right 2b heard*; <u>Sheffield</u> 676 SW2d 542, 549 (Tn 1984) (Important to hear accuseds version)]. Basis of Hall's **actual innocence claim** Post-Con.Rec. Vol. 8, Pg. 1026-27) (Pro-se venue *prejudice claim*.) <u>Schlup v. Delo</u>, 513 US 298, 327 (1995) (Tn.R.Evid., Rule 103 - **Plain Error**). <u>McCoy v La</u>, 584 US _ (2018) (Liberty: to direct case).

7. How does this Eighth Amendment issue apply to Hall's position (when all the reviewing Court's ignored my Autonomy to direct my own case under <u>McCoy</u>, supra claim? <u>See</u>: e.g. <u>Carter v. State</u>, 958 S.W.2d 620, 624 (Tn. 1997) (The state courts already resolved the issue of state law, and the federal courts merely considered whether the **state court's treatment of the error constituted another violation of 8th Amendment**)

8. Here, The Tn. Sup. Ct. produced **misleading dictum** that support claim that Tn.Crim.P., 18, 21, 23, & 43 venue motion steps (**were followed** _when_ _they_ _were_ _not_.) *Creating a false impression*, the trial court had subject-matter jurisdiction to change venues under T.R.A.P., Rule 13(b) & (e) *(without having the mandatory sine quo non records to verify the rules condition precedents were followed)*. The dictums false claims of authority to change venue, were relied upon by other reviewing courts. Also, the Supreme Court lied about the **law of the flag,** (4 U.S.C. § § 1; 10 U.S.C. § 4594; 18 U.S.C. § 715; 22 U.S.C. § 454; and T.C.A. 4-1-301) they use to invoke dual sovereignty and illegally usurp power. **State v. Hall 8 SW3d 598, @ 604 n.6 (Tn 1999)** (Dictum; & Flag denied right to be present; present a defense; & right to testify). Hall's **actual innocence claim,** relies on Post-Con.Rec. V. 8, P. 1026-27 (Denied 6th Amend. right to present a defense; <u>Sheffield</u>, 676 SW2d @ 549 (Tn 1984) (*Prejudice:* Important to hear accuseds' version).

9. Here, State Public records, discuss new powers conferred by statute (in 1933 F.D.R), civil laws at **variance** with criminal law, under Tn.R.Crim.P. Rule

- 48 -

1(e)(1996) (govern venue procedure in criminal cases); Hall tried to protect, to his prejudice. That impermissibly, **shifted the burden of proof,** *to deny the* **strict construction of statutes,** demonstrates a **fraud by the court,** <u>entitling</u> Mr. Hall to **summary judgment for fraud** (under the **unclean hands doctrine.)** See attached: Magevney v. Karsch, 65 S.W.2d 562, 565 [2] (Tn. 1933), listed as **Exhibit [2]**'s (Exhibit [5] Mentioned at **supra page 24, 68;** *Summary Judgment motion / **Fraud*** filed pro-se in 6th Cir. Jan. 2019); Simmons, 561 S.W.2d 460, 465 (Tn. 1977) (**Clean hands** doctrine). The State failed to meet its **burden of proof** TCA § 39-11-201(e). Hall's Madison Co. conviction is **void** on it's face. Trial Tech. Rec., Vol. 1 pg. 2 (Henderson Co. indictment); & Trial Tech. Rec., Vol. 2 pg. 179 (Madison Co. Judgment).

### VIII. HABEAS CORPUS RECORDS VERIFICATION

I _Jon Hall_ , state there are no valid records / affidavits / waiver or consent forms regarding the change of venue in the entire record. Plaintiff in this case has created and read this action.

### IX. SUPPORTING RECORDS

The plaintiff, Jon Hall, should be assisted by his Attorney, Mrs. Kelly Henry, Supervisory Assistant Federal Public Defender. In this matter, she has my consent to assist counsel _____
TO: obtain and file all necessary, pertinent records, as discussed in McLaney v. Bell, 59 S.W.3d 90, 95, n.4 (Tn. 2001) that support allegations raised by the plaintiff, which may include the following:

1) Henderson County Indictment 94-342;

- 49 -

2) Madison County Judgment Form 96-589;

3) (a) 10/10/03 03C-2887; (b) 7/22/10 10C-2789= 2 Habeas Actions, Davidson CO. records;

4) <u>Hall v State</u> 2005 WL 22951 (Tn.Cr.App. 1/5/05);

5) <u>Hall v. State/Bell</u>, 2006 WL 2000502 (Tn.Cr.App. 7/19/06); (filed 10/3/03);

6) <u>Hall v.Bell / State</u>, 2012 WL 1366612 (Tn.Cr. App. 3/16/12)(filed 7/22/10); **5/17/12 Order.**

7) Affidavit Supporting Denial of Due Process & Improper Waiver Of Trial In Henderson Co. with supporting exhibits A-O; and

8) <u>State v. Hall</u>, 8 S.W.3d 593 (Tn. 1999) W1997-00023-SC-DDT-DD (Volumes I-VII) record.

## X. <u>VERIFICATION</u>

I ___*Jon Hall*___, plaintiff, hereby declares under penalty of perjury; that (1) the State **has failed every chance to put up the cited sine quo non records,** by failing to produce: (a) affidavits by 3 Neutral Henderson Co. residents, sustaining cause for venue change & (b) venue change hearing transcript (because there are none). Thus, Hall believes he is entitled to the relief sought. This complies with Tn.R.Civ.P., Rule Rule 56 requirements. <u>Byrd v. Hall</u>, 847 SW2d 208, 214 (Tn. 1992) (Sine Quo Non); & <u>Colon v. Coughlin</u> 58 F.3d 865, 872 (1995) (Affidavits). *The facts made herein is based on my information of the facts I know are true, correct* & entitle Hall to the relief sought.


Sworn & subscribed before me this __ day of July 2019.
Notary Public ___*Jon Hall*___
My Commission Expires ___*Draft*___

— 50 —

## XI.  CERTIFICATE OF SERVICE

I, _Jon Hall_, hereby certify that I have served a true and exact copy of the foregoing writ of civil rights complaint and supporting documents to Defendants: (1) President Donald Tump; 1600 Pennsylvania Ave., Washington D.C. 20500 (www.whitehouse.gov or president@whitehouse.gov ?) (2) Governor of Tennessee, Mr. Bill Lee, State Capitol 1st Floor, Nashville, Tennessee 37243 (www.tennesseeanytime.org/gov [bill.lee@state.tn.us]; 615-741-2011?) (3) Riverbend Maximum Security Inst. (RMSI) Defendant's (www.state.tn.us/correction): (a) Commissioner of Corrections, Mr. Tony Parker 615-741-1000, (b) Chief Warden of Operations, Mr. Tony Mayes 615-350-3100; (c) Security Warden, Mr. Ernest Lewis, (d) Treatment Warden, Mr. Brandon Watwood; (e) Death Row Unit Manager, Mr. Michael Keys, (f) Counselor, Mr. Warren Tate; and (g) Centurian Medical Contractors's, Agent's (h) Dr. Dina Kulenovic; and potential defendant's (i) Dr. Sidberry (j) Robin Hopp, P.A.; and, (k) Benice, Head charge Nurse (nightshift), Each maintaing an Office at RMSI 7475 Cockrill Bend Blvd. Nashville, Tenn. 37243; (2) Atty. Gen., Herbert Slatery, at P.O. Box 20207, Nashville, Tenn. 37202; and (3) United States District Court, Federal Court Clerk, 701 Brodway, Nashville Tennessee 37203; via personal service [X]; or prepaid first-class U.S. mail [ ]; on this the _20th_ day of July 2019.

_Not Served_

_Only_

_Jon Hall_

- 51 -