Westlaw.

Page 1

Not Reported in S.W.3d, 2005 WL 22951 (Tenn.Crim.App.)
(Cite as: 2005 WL 22951 (Tenn.Crim.App.))

**H**
Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee,
at Jackson.
Jon HALL
v.
STATE of Tennessee.

No. W2003-00669-CCA-R3-PD.
Oct. 5, 2004 Session.
Jan. 5, 2005.
Application for Permission to Appeal Denied by Supreme Court June 20, 2005.

Direct Appeal from the Circuit Court for Madison County, No. C00-422; Roy B. Morgan, Judge.
Paul N. Buchanan, Brentwood, Tennessee, and Danny R. Ellis, Jackson, Tennessee, for the appellant, Jon Hall.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; James G. Woodall, District Attorney General; and Alfred Lynn Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID G. HAYES and JAMES CURWOOD WITT, JR., JJ., joined.

**OPINION**
JOSEPH M. TIPTON, J.
*1 The petitioner, Jon Hall, appeals as of right the judgment of the Madison County Circuit Court denying his petition for post-conviction relief from his capital murder conviction. The petitioner was convicted of the 1994 first degree murder of his estranged wife, Billie Jo Hall. At the conclusion of the penalty phase of the trial, the jury found one aggravating circumstance that the murder was especially heinous, atrocious and cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. *See* T.C.A. § 39-13-204(i)(5). The jury further found that the aggravating circumstance outweighed the evidence of mitigating circumstances beyond a reasonable doubt and sentenced the petitioner to death. The petitioner's conviction and sentence of death were affirmed on appeal. *See State v. Hall*, 8 S.W.3d 593 (Tenn.1999), *reh'g denied*, (Dec. 27, 1999), *cert. denied*, 531 U.S. 837, 121 S.Ct. 98, 148 L.Ed.2d 57 (2000). The petitioner filed a *pro se* petition for post-conviction relief on December 7, 2000, which was followed by an amended petition on November 1, 2001. On February 20, 2003, the trial court denied relief and dismissed the petition. The petitioner appeals, claiming that: (1) counsel were ineffective at the guilt phase; (2) counsel were ineffective at the penalty phase; (3) the heinous, atrocious or cruel aggravating circumstance is unconstitutional as applied in this case; (4) the imposition of the death penalty is unreliable and violates principles protected by both the United States and Tennessee Constitutions; and (5) the death sentence is unconstitutional as it infringes upon the petitioner's right to life and is not necessary to promote any compelling state interest. We conclude that no error of law requires reversal, and we affirm the trial court's denial of post-conviction relief.

**Background**
The following facts were developed at the petitioner's trial and noted by the supreme court in the direct appeal. *See Hall*, 8 S.W.3d at 596-99. The petitioner and the victim were married, and the victim had two daughters, Jennifer and Cynthia, from a previous relationship of the victim. The couple had two more daughters, Stephanie and Jessica. The youngest, Jessica, suffered from cerebral palsy. In

© 2013 Thomson Reuters. No Claim to Orig. US Gov.

**Summary Judgment Exhibit [1]**

Not Reported in S.W.3d, 2005 WL 22951 (Tenn.Crim.App.)
(Cite as: 2005 WL 22951 (Tenn.Crim.App.))

part of cross-examination, the children were asked about the petitioner's treatment of them. Mr. Mayo could not think of any motions they could have filed or any witness they could have called that could have made a difference. He admitted that he had access to the state's file and that no surprises were introduced at trial. He said he was only surprised that the state did not introduce more evidence, including statements made by the petitioner.

*13 Jesse Ford, lead counsel appointed to represent the petitioner, testified that this was his first capital case. Mr. Ford said that he and Mr. Mayo agreed that he would handle the guilt phase and Mr. Mayo would handle the mitigation work. Mr. Ford recalled speaking to one of the petitioner's sisters, Sheryl Arbogast, once or twice. He stated that Mr. Mayo talked to her a lot because that was more of the mitigation part of the case. Mr. Ford could not recall speaking to other family members in preparation of the case, although he stated that he "may have."

Mr. Ford testified that Jeff Hall was already deceased at the time of his appointment and that his testimony had not been preserved in any "for sure" admissible form. Mr. Ford said that if a witness had something useful, a deposition would have been warranted. He said that Mr. Hall's unavailability at trial was not predictable because one's time of death is uncertain.

Regarding the change of venue, Mr. Ford recalled reading newspaper articles and determining that a change of venue was "absolutely necessary." He said that this matter was discussed with the petitioner at length and that a motion was filed with the petitioner's permission. Mr. Ford stated that Judge LaFon granted the change without a hearing. Mr. Ford only became aware of the petitioner's dissatisfaction with the change of venue after the fact.

Mr. Ford testified that one of the defense theories before trial was voluntary intoxication. The petitioner had consumed five or six beers before going to the victim's residence. Mr. Ford attempted to find witnesses who knew that the petitioner had a drinking problem. He said the petitioner refused to testify. Based on these factors, he decided that the defense was unable to pursue this avenue at trial. Mr. Ford said that, ultimately, the defense hoped that the "jury would show some mercy." He said the defense relied upon a theory that the petitioner was acting in an impulsive manner.

Mr. Ford testified that he believed the possibility of reducing the charge to manslaughter was slim because the petitioner refused to testify. He stated that a jury wanted to hear from a defendant. Mr. Ford discussed with the petitioner the need for him to testify, but the petitioner refused to take the stand. Agreeing that proof of the victim's acts of violence against the petitioner would have been evidence of provocation, Mr. Ford explained that the only reliable source of this type of testimony was from the petitioner.

Mr. Ford testified that the petitioner provided counsel with a list of people he wanted found. Mr. Ford said that they sought every available person but that he determined that the witnesses' testimony would not be helpful. Mr. Ford stated that, for instance, the Brittains' statements included the petitioner's threat that "he was going to grind [the victim] up as hamburger meat." Mr. Ford recalled that the petitioner made this statement to several different people, and he believed the statement precluded any opportunity to call these people as witnesses. Mr. Ford admitted that he did not talk with Kathy Hugo and Debbie Davis. He acknowledged that the petitioner's sister, Sheryl Arbogast, wanted to testify, but he said Ms. Arbogast had no contact with the petitioner for two years before the murder. On cross-examination, Mr. Ford stated that "from what I understood, [the petitioner's sisters] didn't have a very good relationship with Mr. Hall, that they weren't really a part of his life until after he did what he did, and then they became ... more a part of his life...."

*14 Evaluating the evidence establishing premeditation, Mr. Ford recalled that the petitioner had

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2005 WL 22951 (Tenn.Crim.App.)
(Cite as: 2005 WL 22951 (Tenn.Crim.App.))

in 1995. He acknowledged that the results were presented first at the American Psychiatric Association Convention in 2001. He also agreed that this information is not contained in the current DSM4. Dr. Caruso further conceded that the petitioner's act of disconnecting the telephone lines for whatever purpose established that he was capable of "some degree of preplanning."

*19 The petitioner testified regarding the attorneys that had been appointed to represent him at trial:

Jack Hinson and Frank Stanfill were appointed. I heard that Frank Stanfill never had any in court experience at the time, and that Jack Hinson was the Public Defender at the time, but he was going into private practice and Frank Stanfill was just taking over that position.

....

Well, the next time I went into court I went in for my Grand Jury appearance and they asked me did I have an attorney and I had not spoken to my attorney and the people at the courthouse told me that Jack Hinson was no longer with the Public Defender's Office. So the Judge asked me, you know, "Do you plead guilty or not guilty," and

....

[a]fter Frank Stanfill and Jack Hinson I went through George Googe and Stephen Spracher.

....

And after that I had Carthel Smith and Mike Mosier.

....

And then I went through my trial attorneys, Jesse Ford and Clayton Mayo.

....

And then I had on direct appeal ... Mark Donahoe and Scott Petrowski.

The petitioner testified that his brother, Jeff Hall, had resided in Bell County, Texas, and had been suffering from AIDS since the early 1990's. He said he knew in August 1994 that his brother was sick. He said he informed his attorneys that they needed to interview Jeff because of the danger of him dying before trial. He could not recall, however, whether he told them that Jeff was dying of AIDS. The petitioner did assert that he was absolutely sure that he made George Googe and Steven Spracher aware of it before his brother died and "pretty sure" that he made Frank Stanfill aware of it. He said he had to go to trial without the benefit of a statement by Jeff.

The petitioner testified that he neither waived his right to a preliminary hearing nor asserted that he wanted to change venue to Madison County. When questioned as to the possibility of testifying, he said his attorneys conducted a mock examination of him and told him they did not believe he should testify. The petitioner asserted that he wanted to testify before a Henderson County jury. He added, however, that he also "argu[ed] an issue about the fact that the flag had a gold fringe and an eagle on it, and I told 'em that I felt that it was a ... representative of a war court...."

The petitioner testified that attorneys Ford and Mayo were appointed on February 9, 1996, and that the trial began on February 3, 1997. He complained that counsel visited him on only two occasions while he was in Nashville. He said he was transferred to Madison County in December 1996. While confined in Madison County, the petitioner was visited separately by counsel approximately five times. He complained that his attorneys never explained to him their defense theory. He stated that, if they had asked, he could have provided them with prior acts of violence perpetrated by the victim against him. He explained, however, that his attorneys did not want anything negative said about the victim during the trial. The petitioner added that his attorneys failed to present the Pearson sisters as

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2005 WL 22951 (Tenn.Crim.App.)
(Cite as: 2005 WL 22951 (Tenn.Crim.App.))

*21 Dr. Stalford defined Intermittent Explosive Disorder as

> a psychiatric disorder that falls under the impulse control disorders like cleptomania, and it is classified by impulsive outbursts which usually inflict harm on objects or people. The diagnosis is-describes-The second criteria includes the outbursts in excess of what one would expect, and the third aspect of that diagnosis is that it can't be better explained by another psychiatric illness.

As a result of her evaluation, Dr. Stalford could not conclude that the petitioner had Intermittent Explosive Disorder because his behaviors were better described by other psychiatric illnesses. She stated:

> I believe that he has what we would describe as a personality disorder, and very much as Middle Tennessee described it, where he has some passive/aggressive traits, dependant traits, but I think the most notable traits are what we call anti-social traits or sociopathy, and within that diagnosis, there is a reckless disregard of other people and agitated and potentially violent acts, and I think his behavior is better explained under that diagnosis than intermittent explosive disorder.

She also diagnosed the petitioner with alcohol dependence.

Dr. Stalford explained that:

> Serotonin is a chemical in our brains. It is the way that nerves connect. When you have a nerve and the nerve stops, you need that nerve to talk to the next nerve, and the way it does it is the nerve releases a chemical that causes what we call the synapse to the next nerve, and that's how the nerves talk. And one of the chemicals in the brain that does that is serotonin.... [S]erotonin is what we call a neurotransmitter which basically is the way that nerves talk to each other.

She testified that because there are "so many medical neurological and psychiatric conditions that have been linked to altered serotoninergic levels that it's really not a terribly useful diagnostic test, which is why the forensic unit at Middle Tennessee doesn't even do it." She said that low serotonin levels have been identified in patients suffering from depression, schizophrenia, bipolar disorder, impulsive acts of violence, mood disorders, anti-social personality disorders, borderline personality disorders, myoclonus, dementia, sleep disorders, and even malnutrition. Dr. Stalford further discounted the usefulness of serotonin levels as a diagnostic tool by stating that (1) serotonin levels measured in the spinal fluid are not an accurate indication of the serotonin activity in the synapses where it works and (2) there is much question as to what are "normal" levels of serotonin. She stated that she reviewed the serotonin test results contained in Dr. Caruso's report.

Dr. Stalford concluded that, based on the events on the night of the murder, that the petitioner was able to think clearly and plan certain aspects of that night. She stated that neither drugs, alcohol, nor any psychiatric condition could explain the petitioner's loss of control. [handwritten: Note: Everything prior is Dictum]

**Summary of Trial Court's Findings of Fact and Conclusions of Law**

*22 The trial court rendered a comprehensive and extensive order reviewing the evidence presented and rendering legal conclusions as to the petitioner's allegations of constitutional error. After evaluating the evidence presented at the post-conviction hearing and the trial, the trial court made numerous findings of fact. The trial court found that the defense strategy at trial was that the petitioner did not plan to kill the victim but was merely attempting to pay child support and reconcile with the victim. The incident was characterized as an emotional domestic situation that merely escalated and got out of control. Defense counsel's questioning of witnesses was consistent with this theory throughout the trial. The trial court noted trial counsel's skillful cross-examination of state witnesses, including introducing proof supporting their theory that the petitioner was intoxicated at the time of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.