**EXHIBIT**

**A**

## SETTLEMENT AGREEMENT

This Settlement Agreement ("**Agreement**") is entered into effective as of the last date signed below ("**Effective Date**") by and between Jon Hall ("**Mr. Hall**") on the one hand, and Lisa Helton, in her official capacity as Interim Commissioner of the Tennessee Department of Correction ("**Commissioner Helton**"); Tony Mays, in his official capacity as Warden of Riverbend Maximum Security Institution ("**Warden Mays**"); and George Firestine, in his official capacity as Unit Manager of Riverbend Maximum Security Institution ("**Unit Manager Firestine**") on the other (Commissioner Helton, Warden Mays, and Unit Manager Firestine representing, collectively, the "**Tennessee Department of Correction**" and Mr. Hall and the Tennessee Department of Correction each individually, "**Party,**" and collectively, "**Parties**"):

## RECITALS

**WHEREAS**, Mr. Hall, Tennessee Department of Correction Inmate #238941, is serving a sentence on death row at Riverbend Maximum Security Institution ("**RMSI**"), located in Nashville, Tennessee;

**WHEREAS**, all death row inmates at RMSI live in a housing unit known as Unit II ("**Unit II**");

**WHEREAS**, on July 24, 2019, Mr. Hall commenced a lawsuit pro se in the United States District Court for the Middle District of Tennessee against multiple government officials and members of the Tennessee Department of Correction alleging violations of his civil rights in connection with his living conditions on Unit II;

**WHEREAS**, by court order on October 2, 2019, the United States District Court for the Middle District of Tennessee appointed Bill Harbison ("**Mr. Harbison**") and Eric Osborne ("**Mr. Osborne**") of the law firm Sherrard Roe Voigt & Harbison, PLC ("**SRVH**") as legal counsel for Mr. Hall;

**WHEREAS**, on April 7, 2020, through counsel, Mr. Hall filed a fourth amended complaint, styled as *Jon Hall v. Tony Parker et al.*, No. 3:19-cv-00628, against the Tennessee Department of Correction in the United States District Court for the Middle District of Tennessee ("**Action**");

**WHEREAS**, in the Action, Mr. Hall alleged that conditions on Unit II violated his rights under the Eighth and Fourteenth Amendments of the United States Constitution, the federal Americans with Disabilities Act, and Tenn. Code Ann. § 41-21-402 ("**Mr. Hall's Claims**");

**WHEREAS**, the Tennessee Department of Correction denies all of Mr. Hall's Claims and has defended the Action accordingly;

**WHEREAS**, the Parties have engaged in extensive discovery and settlement negotiations in an effort to resolve the Action;

Case 3:19-cv-00628   Document 123-1   Filed 04/08/22   Page 1 of 24 PageID #: 1326

**WHEREAS,** by court order on July 27, 2021, Mr. Bradley A. MacLean ("**Mr. MacLean**") was appointed guardian ad litem of Mr. Hall for the purposes of mediation and settlement discussions; and

**WHEREAS,** without conceding any claims or defenses raised in the Action, the Parties now wish to resolve the Action and Mr. Hall's Claims amicably to avoid the risks and expense of further litigation;

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein, the mutual execution of this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby specifically contract, covenant, and agree as follows:

## I. GENERAL PROVISIONS

1. **Recitals.** The foregoing recitals are contractual in nature and are mutual representations of the Parties.

2. **Warranty and Voluntary Agreement.** Mr. Hall and the Tennessee Department of Correction warrant that they have entered into this Agreement voluntarily and of their own accord without reliance on any inducement, promise, or representation by any other Party, except those that are expressly set forth in this Agreement. This Agreement contains and constitutes the entire understanding and agreement between Mr. Hall and the Tennessee Department of Correction respecting the subject matter hereof, and all oral discussions and prior agreements are merged herein.

3. **Warranty of Understanding and Acknowledgement.** Mr. MacLean, in his capacity as Mr. Hall's guardian ad litem, and the Tennessee Department of Correction have carefully read this Agreement, know, and understand its contents, and freely and voluntarily agree to all of its terms and conditions.

4. **No Admission of Liability.** It is expressly understood and agreed that this Agreement is entered into solely to avoid the expense and inconvenience of additional legal proceedings. This Agreement is not to be construed as an admission of any impropriety, illegality, liability, or satisfaction on the part of any of the Parties.

5. **Applicable Law.** Except to the extent any provision is governed by federal law that supersedes state law, the validity, construction, and enforcement of this Agreement shall be determined according to the laws of the State of Tennessee without giving effect to any choice of law or conflict of law provisions or rules (whether of the State of Tennessee or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of Tennessee.

6. **Amendment and Waiver in Writing.** No provision of this Agreement can be amended or waived, except by a statement in writing signed by the Party against which enforcement of the amendment or waiver is sought, and any such waiver shall apply only to the matter or instance specifically waived.

7. **Severability.** Should any provision of this Agreement be declared invalid or unenforceable by operation of law or by any tribunal of competent jurisdiction for any reason, the remaining provisions hereof shall remain in full force and effect.

8. **Construction.** This Agreement has been jointly negotiated. The language of this Agreement shall be construed as a whole according to its fair meaning and not strictly construed for or against any Party.

9. **Authorization.** The representatives executing this Agreement on behalf of the Parties are empowered to do so and thereby bind the Parties according to the terms of this Agreement.

10. **Further Assurances.** The Parties agree to take all actions reasonably necessary to effectuate the approval, performance, validity, and enforceability of this Agreement.

11. **Counterparts.** This Agreement may be executed simultaneously in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The telecopied, digitally scanned, or electronically signed signature of a party hereto shall be considered as if it was the original.

## II.   CHANGES TO CONDITIONS OF CONFINEMENT

12. **Policy Changes.** On or before April 1, 2022, the Tennessee Department of Correction shall enact and implement the revised Tennessee Department of Correction Policy 503.03 entitled "Program Levels for Inmates Under Sentence of Death" attached hereto as *Exhibit A* ("**Revised Policy 503.03**"). The Tennessee Department of Correction does review and revise policies on a regular basis. TDOC agrees that, in the event of a future change to Policy 503.03, the change will not affect the matters that the Parties have agreed to with respect to Mr. Hall in this Agreement.

13. **Structural Changes.** On or before April 1, 2022, the Tennessee Department of Correction shall complete the installation of mesh cages over the entrances of nine (9) lower tier C-pod cells, as reflected in *Exhibit B* attached hereto ("**Mesh Cages**").

14. **Socialization Opportunities for Level C Inmates.** The Parties acknowledge and agree that the purpose of the Mesh Cages is to provide inmates assigned to Program Levels B and C under Revised Policy 503.03 more opportunities to participate in group programming and socialization. Within thirty (30) days of completion of the Mesh Cages, the Tennessee Department of Correction shall update Revised Policy 503.03 to reflect that Level B and C inmates are offered the same opportunities to participate in group programming as Level A inmates. Level C inmates may participate via the Mesh Cages

3

## MR. HALL'S TREATMENT PLAN

15. **Individualized Treatment Plan.** Upon the Effective Date, the Tennessee Department of Correction shall continue to ensure that Mr. Hall receives, at a minimum, the following services:

      a. medication management two (2) times monthly;

      b. individual therapy out of cell two (2) times weekly;

      c. daily cell door check-ins from behavioral health staff;

      d. weekly therapeutic worksheets documented as progress notes; and

      e. weekly recreational therapeutic activities documented as progress notes

(collectively, "**Individualized Treatment Plan**").

The Tennessee Department of Correction acknowledges and agrees that the Individualized Treatment Plan shall remain in place for Mr. Hall as long as there are no significant disciplinary infractions or escape attempts. If there is a change due to a significant disciplinary infraction or escape attempt, the Tennessee Department of Correction will notify Mr. Harbison, Mr. Osborne, and/or Mr. MacLean. Upon request, the Tennessee Department of Correction shall provide Mr. Harbison, Mr. Osborne, and/or Mr. MacLean with documentation evidencing the implementation of the Individualized Treatment Plan.

## III. ATTORNEY'S FEES AND RELATED COSTS; PAYMENT.

16. **Attorney's Fees and Costs.** The Tennessee Department of Correction shall pay $225,000.00 in full and complete satisfaction of any and all of Mr. Hall's claims for attorney's fees and costs up to the Effective Date ("**Fee Payment**"). The Fee Payment shall be made by check and delivered to Sherrard Roe Voigt & Harbison, PLC within thirty (30) days of the Effective Date.

17. **Payment to Mr. Hall.** Within thirty (30) days of the Effective Date, the Tennessee Department of Correction shall pay $3,000.00 to Mr. Hall by depositing such sum into his inmate trust fund account ("**Individual Payment**"). Mr. Hall may use the Individual Payment as he wishes in accordance with any Tennessee Department of Correction policies applicable to inmate trust fund accounts.

## IV. NOTICE

All notices and other communications required or permitted under this Agreement shall be considered validly given, made, or served if in writing and delivered personally, by nationally recognized overnight express courier, or by certified mail with postage prepaid and return receipt requested, to the following addresses:

4

*If to Mr. Hall:*

> Attention: William L. Harbison and Eric G. Osborne
> Sherrard Roe Voigt & Harbison, PLC
> 150 3rd Avenue South, Suite 1100
> Nashville, Tennessee 37201
> bharbison@srvhlaw.com | eosborne@srvhlaw.com

> *and*

> Bradley A. MacLean
> 1702 Villa Place
> Nashville, TN 37212
> brad.maclean9@gmail.com

*If to Tennessee Department of Correction:*

> Debra K. Inglis
> General Counsel and Deputy Commissioner, Tennessee Department of Correction
> 320 6th Avenue North, 6th Floor
> Rachel Jackson Building
> Nashville, TN 37243
> Debbie.Inglis@tn.gov

The Parties further agree to give notice by email in conjunction with any of the above listed methods for physical delivery; however, email alone will not constitute notice to a Party under this provision unless the Party being noticed responds in writing (email sufficient) to acknowledge receipt and sufficiency of the emailed notice.

## V.    MONITORING AND ENFORCEMENT OF AGREEMENT

18.    **Dismissal, Forum, and Jurisdiction.** Within five (5) days after both receipt of the Fee Payment and deposit of the Individual Payment, the Parties shall file a joint motion to dismiss the Action in the United States District Court for the Middle District of Tennessee ("**Dismissal**"). Such Dismissal shall provide that the United States District Court for the Middle District of Tennessee shall retain jurisdiction over the Parties to seek remedies for any breach of the Agreement. The Parties hereby consent to personal jurisdiction and venue in the United States District Court for the Middle District of Tennessee.

19.    **Monitoring.** In the event that Mr. Hall is charged with a disciplinary infraction or experiences a change in his program level under Policy 503.03, the Tennessee Department of Correction shall notify Mr. Harbison, Mr. Osborne, and Mr. MacLean pursuant to Section V within five (5) days of the infraction or the change in status. Such notice shall contain a summary, explanation, and list of parties involved in the infraction or the change in status.

20.     **Visitation.** Mr. Harbison, Mr. Osborne, and Mr. MacLean shall be entitled to visit Mr. Hall, individually or collectively, on a regular basis in accordance with RMSI and Tennessee Department of Correction policies regarding inmate visitation with legal counsel. Mr. Harbison, Mr. Osborne, and Mr. MacLean shall be considered Mr. Hall's legal counsel for purposes of visitation until Mr. Hall's death or release from prison.

21.     **Remedies.** In the event of any breach of this Agreement, the Parties shall have all remedies that may be available to them at law or in equity, except the right to rescind or invalidate the Agreement. In the event of any material breach of this Agreement, the substantially prevailing party shall be entitled to an award of its reasonable attorney's fees incurred, as well as all costs and expenses of litigation and collection.

**IN WITNESS WHEREOF,** the parties have signed this Agreement on the date(s) shown below:

**[SIGNATURE PAGE TO FOLLOW]**

**Jon Hall**

By:       Bradley A. MacLean

*In his capacity as Mr. Hall's Guardian Ad Litem*

Date:    3/25/22

**Tennessee Department of Correction**

Lisa Helton
2022.03.25 08:19:55
-05'00'

By:       Lisa Helton

*In her official capacity as its Interim Commissioner*

Date:    3/25/22



ADMINISTRATIVE POLICIES
AND PROCEDURES
State of Tennessee
Department of Correction

| Index #: 503.03 | Page 1 of 7 |
| Effective Date: March 15, 2018 | |
| Distribution: LD | |
| Supersedes: 503.03 (3/15/15) PCN 17-34 (3/31/17) | |

Approved by: Tony Parker

Subject: PROGRAM LEVELS FOR INMATES UNDER SENTENCE OF DEATH

I. <u>AUTHORITY</u>: TCA 4-3-603 and TCA 4-3-606.

II. <u>PURPOSE</u>: To establish criteria and procedures for a review process and criteria for the assignment of program levels for inmates sentenced to death.

III. <u>APPLICATION</u>: To all Tennessee Department of Correction (TDOC) employees and to all inmates under the sentence of death.

IV. <u>DEFINITIONS</u>:

A. <u>Behavioral Health Administrator (BHA)</u>: A licensed or qualified mental health professional approved by the Warden/Superintendent and the Director of Behavioral Health Services to assume the responsibility of coordinating the delivery of behavioral health services.

B. <u>Program Level</u>: An assigned assessment which provides for specified work and programmatic activities of an inmate sentenced to death.

C. <u>Qualified Mental Health Professional</u>: For purposes of this policy, a licensed psychological examiner or other individual who is professionally licensed/certified as a therapeutic professional or a mental health professional having a master's degree in the behavioral sciences.

D. <u>Unit Manager</u>: For purposes of this policy only, an employee appointed by the Warden who is responsible for the overall operation of all phases of the unit for inmates sentenced to death which includes programming within the housing unit or zone.

E. <u>Unit Review Panel</u>: A group of staff appointed by the Warden who meet regularly to assess an inmate's current circumstances and make recommendations for any suitable changes in the inmate's status.

V. <u>POLICY</u>: The unit review panel shall assess all available information regarding an inmate sentenced to death to ensure that appropriate recommendations are made regarding the inmate's program level status and periodically make recommendations for any appropriate changes in the inmate's assigned program level. All inmates sentenced to death shall be assigned into a program level.

VI. <u>PROCEDURES</u>:

A. Inmates received by the TDOC who are sentenced to death shall be initially classified in accordance with Policy #401.04 and assigned to Program Level C. All housing and programming of permanently assigned inmates sentenced to death shall occur within the following units:

1. RMSI-Unit 2, Building 2A, and Unit 1 (available only for overflow as necessary)

        2.      TPFW-Unit 3

B.    The Warden shall appoint the Unit Review Panel. The Panel shall meet every thirty days to conduct a comprehensive diagnostic review/interview of each inmate's level. The unit Review panel shall consist of:

    1.    Chairperson**:** Unit Manager (Alternate: Chief Counselor)

    2.    Members (1): ranking officer/correctional officer.

    3.    Member of the facilities Behavioral Health staff

    4.    Member of the Treatment Team

C.    Level C inmates shall not be scheduled to meet the Unit Review Panel until they have fulfilled a complete eighteen months in Level C.

    1.    If the inmate has experienced a significant absence from the program during the initial 12 month period on Level C, the review shall be delayed for a corresponding period.

    2.    Unless the review is further delayed in accordance with (C)(1), if the inmate is temporarily away from his/her permanent assigned facility when the 12 month review is due, the review shall be completed within 30 days upon the inmate's return.

D.    Subsequent reviews shall be scheduled so that each inmate under the sentence of death is reviewed by the unit review panel for his/her progress and adjustment, or for level advancement consideration, if eligible. Inmates sentenced to death shall be reclassified at least annually in accordance with Policy #401.04. Reviews occur in accordance with the following schedule:

    1.    Level C and B within six months or as necessary or due to administrative or disciplinary reasons.

    2.    Level A within 12 months or as necessary or due to administrative or disciplinary reasons.

E.    Inmates shall be provided the opportunity to be present during their hearings before the unit review panel. Inmates who refuse to appear before the unit review panel are subject to reduction of level assignment.

F.    Conviction of any disciplinary infraction will automatically result in a review by the unit review panel and possible reassignment to an appropriate program level.

G.    On a weekly basis, the Unit Adjustment Form, CR-3343, shall be completed by a unit team member. This form provides documentation of observed inmate behavior, staff perceptions of the inmate's adjustment to unit activities, and a description of the inmate's interaction with staff and other inmates.

H.    On a weekly basis, the Cell Inspection Form, CR-3115, shall be completed by a unit team member. This form includes a checklist of observable items which shall be inspected for cleanliness, damage, obstructions, neatness and contraband.

I.    The unit review panel, when reviewing an inmate for program level assessment, shall review all completed CR-3343 forms and CR-3115 forms completed during the time frame of the review. In addition, the following items shall be considered by the panel when recommending a level change:

1.    Inmate's disciplinary record

2.    Past criminal record

3.    Past record of incarceration(s)

4.    Criminal activity in prison or jail

5.    Record of violent reactions to stressful situations

6.    Institutional record on work/education assignment

7.    Adjustment to unit activities

8.    Willingness and ability to live harmoniously among others

9.    Incompatibility with other inmates

10.    Attitude toward authority

11.    Personal hygiene

12.    Involvement in STG activities

13.    Psychological, psychiatric, and/or other behavioral health or medical evaluations completed within the past six months as provided by the institutional medical staff.

14.    Other information or special consideration that may reflect on the appropriateness of the level placement.

J.    Program level assignments recommended by the unit review panel are subject to the approval of the unit manager and Associate Warden of Security.

1.    Actions shall be documented on the Unit Review Panel Hearing Sheet, CR-2937.

2.    The specific reasons for unit level review decisions must be stated and shall include consideration of behavioral health concerns identified in the course of evaluation pursuant to paragraph I.13 foregoing.

3. Any level change from Level C requires the approval of the Warden. Inmates may appeal final decisions using Classification Appeal, CR-3004.

K. Inmates shall be assigned to program levels as follows:

1. Level C: All newly death sentenced inmates received at an institution shall be placed in Level C. An inmate shall remain at this level for a total of 12 months prior to receiving consideration for Level B. Available programming activities:

    a. Individual exercise – two hours per day

    b. Individual religious counseling

    c. All C level prisoners will receive a visit from the mental health team at least once every 30 days and will be given the opportunity to participate in a private out-of-cell meeting with mental health staff.

    d. Individual education

    e. Legal help from inmate legal assistants, on a non-contact visit basis, not to exceed a total of two hours each week as scheduled by the unit manager/designee.

    f. Non-contact visitation twice a week for no more than one hour per visit. After 12 months at Level C, a contact visit may be granted by the Associate Warden of Security based upon a favorable review of Section VI. (I)(5,6,7,8,10, and 11)

    g. Limited to one package every six months.

    h. Restraints shall be mandatory for all inmates classified to this level.

    i. May participate in in-cell arts and crafts on an individual basis, at the discretion of the Warden, according to demonstration of appropriate behavior.

2. Level B: An inmate must remain at this level for 9 months, disciplinary-free, prior to receiving consideration for Level A placement pending review in accordance with Section VI.(F). Available programming activities:

    a. Participate in groups of six or less for the following:

        (1) Education

        (2) Exercise – a minimum of two hours per day

        (3) Religious services/activities

        (4) Individual group counseling

      (5)    Legal help from inmate legal assistants, on a non-contact visit basis, not to exceed a total of two hours each week as scheduled by the unit manager/designee.

    b.    Contact or non-contact visits, at the discretion of the Associate Warden of Security –twice a week for a total of three hours maximum

    c.    Limited to one package every three months

    d.    Restraints shall be mandatory for all inmates classified to this level. Restraints may be removed while an inmate is in a conference area or treatment area at the discretion of the unit manager. Wardens shall develop policies and procedures setting forth restraint procedures when inmates are out of their cells.

3.    Level A: Inmates at this level must maintain an overall exceptional rating in the unit and remain free from disciplinary convictions, pending review in accordance with Section VI (D). Available programming activities:

    b.    Participation in the following activities in groups (of other inmates under sentence of death) at the discretion of the unit manager:

      (1)    Exercise - a minimum of two hours per day

      (2)    Education

      (3)    Arts and crafts, if available

      (4)    Religious services/activities

      (5)    Individual or group counseling

      (6)    Group dinners, if appropriate and approved by the unit manager

      (7)    Cards and certain boards games, if appropriate and approved by the unit manager

      (8)    Use of active/passive multipurpose rooms as designated by the unit manager

      (9)    Law clerk or legal advisor from the population shall visit in the non-contact visiting area not to exceed one hour per day as scheduled by the unit manager, Monday through Friday. Access to library shall be established in local policies and procedures.

      (10)    Movement in and out of their cells within the unit and exercise yards without restraints.

    c.    Contact visits – twice a week for a total of three hours or more, depending on space availability, as approved by the Associate Warden of Security.

        d.      Limited to one package every three months.

L.    If an inmate on any level elects not to participate in recreation or group programming for a period of thirty days or more, **unit manager** shall notify the Behavioral Health Administrator.

    a.    The Behavioral Health Administrator shall upon receipt of such notice arrange for a Qualified Mental Health Professional (QMHP) to conduct an assessment of the inmate's mental health condition.

    b.    Upon completion of the assessment, the QMHP shall recommend to the Behavioral Health Administrator and **unit manager** any recommendation for an immediate clinical intervention. The QMHP shall in all events document the findings and recommendations from the assessment, on the problem-oriented, CR-1884.

M.    Regardless of the disciplinary sanction imposed on an offender by reason of conviction for a disciplinary infraction, an offender on death row may be demoted one level or two levels. When an offender receives a demotion they will not be eligible for a level increase for a period of between 3 and 12 months depending on the severity of the infraction, as determined by the following matrix:

| Offender level | Disc. Class | New Level | Consideration |
|---|---|---|---|
| A | A | C | 12 months |
| A | B | B | 6 months |
| A | C | B | 3 months |
| | | | |
| B | A | C | 12 months |
| B | B | C | 6 months |
| B | C | C | 3 months |
| | | | |
| C | A | C | 12 months |
| C | B | C | 6 months |
| C | C | C | 3 months |

N.    Program assignments to Level A or B and the housing assignments of inmates under sentence of death who is permanently assigned to a facility other than RMSI or TPW shall be approved or disapproved by the Assistant Commissioner of Prisons/designee. The Assistant Commissioner of Prisons/designee shall consider all relevant circumstances including, but not limited to, the following:

    1.    The safety of the inmate

    2.    The safety of other inmates

| Subject: PROGRAM LEVELS FOR INMATES UNDER SENTENCE OF DEATH |

3.     The security of the institution

N.     Any exceptions to this policy require the prior approval of the Commissioner.

O.     The Warden of any facility permanently housing inmates under sentence of death shall develop local policies and procedures to administer this policy.  These policies require the

P.     News Media - contact with news media shall be in accordance with Policy #103.04.

Q.     Inmates in all levels shall be in full restraints when he/she leaves the building for medical, court, etc.  Inmates assigned to Deberry Special Needs Facility for medical/behavioral health reasons will be treated as a level C inmate.

VII.     <u>ACA STANDARDS</u>:  None.

VIII.    <u>EXPIRATION DATE</u>:  March 15, 2021.

**ADMINISTRATIVE POLICIES AND PROCEDURES**
State of Tennessee
Department of Correction

Approved by: _Lisa Helton_

Subject: PROGRAM LEVELS FOR INMATES UNDER SENTENCE OF DEATH

I. <u>AUTHORITY</u>: TCA 4-3-603 and TCA 4-3-606.

II. <u>PURPOSE</u>: To establish criteria and procedures for a review process and criteria for the assignment of program levels for inmates sentenced to death.

III. <u>APPLICATION</u>: To all Tennessee Department of Correction (TDOC) employees and to all inmates under the sentence of death.

IV. <u>DEFINITIONS</u>:

A. <u>Behavioral Health Administrator (BHA)</u>: A licensed or qualified mental health professional approved by the Warden/Superintendent and the Director of Behavioral Health Services to assume the responsibility of coordinating the delivery of behavioral health services.

B. <u>Program Level</u>: An assigned assessment which provides for specified work and programmatic activities of an inmate sentenced to death.

C. <u>Qualified Mental Health Professional</u>: For purposes of this policy, a licensed psychological examiner or other individual who is professionally licensed/certified as a therapeutic professional or a mental health professional having a master's degree in the behavioral sciences.

D. <u>Unit Manager</u>: For purposes of this policy only, an employee appointed by the Warden who is responsible for the overall operation of all phases of the unit for inmates sentenced to death which includes programming within the housing unit or zone.

E. <u>Unit Review Panel</u>: A group of staff appointed by the Warden who meet regularly to assess an inmate's current circumstances and make recommendations for any suitable changes in the inmate's status.

V. <u>POLICY</u>: The unit review panel shall assess all available information regarding an inmate sentenced to death to ensure that appropriate recommendations are made regarding the inmate's program level status and periodically make recommendations for any appropriate changes in the inmate's assigned program level. All inmates sentenced to death shall be assigned into a program level.

VI. <u>PROCEDURES</u>:

A. Inmates received by the TDOC who are sentenced to death shall be initially classified in accordance with Policy #401.04 and assigned to Program Level C. All housing and programming of permanently assigned inmates sentenced to death shall occur within the following units:

1. RMSI-Unit 2, Building 2A, and Unit 1 (available only for overflow as necessary).

    2.    DJRC-Unit 3.

B.    The Warden shall appoint the unit review panel. The Panel shall meet every thirty days to conduct a comprehensive diagnostic review/interview of each inmate's level. The unit review panel shall consist of:

    1.    Chairperson: unit manager (Alternate: Chief Counselor).

    2.    Members (1): ranking officer/correctional officer.

    3.    Member of the facilities Behavioral Health staff.

    4.    Member of the Treatment Team.

C.    Level C inmates shall not be scheduled to meet the unit review panel until they have fulfilled a complete eighteen months in Level C.

    1.    If the inmate has experienced a significant absence from the program during the initial 12-month period on Level C, the review shall be delayed for a corresponding period.

    2.    Unless the review is further delayed in accordance with (C)(1), if the inmate is temporarily away from his/her permanent assigned facility when the 12-month review is due, the review shall be completed within 30 days upon the inmate's return.

D.    Subsequent reviews shall be scheduled so that each inmate under the sentence of death is reviewed by the unit review panel for his/her progress and adjustment, or for level advancement consideration, if eligible. Inmates sentenced to death shall be reclassified at least annually in accordance with Policy #401.04. Reviews occur in accordance with the following schedule:

    1.    Level C and B within six months or as necessary or due to administrative or disciplinary reasons.

    2.    Level A within 12 months or as necessary or due to administrative or disciplinary reasons.

E.    Inmates shall be provided the opportunity to be present during their hearings before the unit review panel. Inmates who refuse to appear before the unit review panel are subject to reduction of level assignment.

F.    Conviction of any disciplinary infraction will automatically result in a review by the unit review panel and possible reassignment to an appropriate program level.

G.    On a weekly basis, the Unit Adjustment Form, CR-3343, shall be completed by a unit team member. This form provides documentation of observed inmate behavior, staff perceptions of the inmate's adjustment to unit activities, and a description of the inmate's interaction with staff and other inmates.

H.      On a weekly basis, the Cell Inspection Form, CR-3115, shall be completed by a unit team member. This form includes a checklist of observable items which shall be inspected for cleanliness, damage, obstructions, neatness and contraband.

I.      The unit review panel, when reviewing an inmate for program level assessment, shall review all completed CR-3343 forms and CR-3115 forms completed during the time frame of the review. In addition, the following items shall be considered by the panel when recommending a level change:

1.      Inmate's disciplinary record.

2.      Past criminal record.

3.      Past record of incarceration(s).

4.      Criminal activity in prison or jail.

5.      Record of violent reactions to stressful situations.

6.      Institutional record on work/education assignment.

7.      Adjustment to unit activities.

8.      Willingness and ability to live harmoniously among others.

9.      Incompatibility with other inmates.

10.      Attitude toward authority.

11.      Personal hygiene.

12.      Involvement in STG activities.

13.      Psychological, psychiatric, and/or other behavioral health or medical evaluations completed within the past six months as provided by the institutional medical staff.

14.      Other information or special consideration that may reflect on the appropriateness of the level placement.

J.      Program level assignments recommended by the unit review panel are subject to the approval of the unit manager and Associate Warden of Security.

1.      Actions shall be documented on the unit review panel Hearing Sheet, CR-2937.

2.      The specific reasons for unit level review decisions must be stated and shall include consideration of behavioral health concerns identified in the course of evaluation pursuant to paragraph I.13 foregoing.

3. Any level change from Level C requires the approval of the Warden. Inmates may appeal final decisions using Classification Appeal, CR-3004.

K. <u>Inmates shall be assigned to program levels as follows</u>:

1. Level C: All newly death sentenced inmates received at an institution shall be placed in Level C. An inmate shall remain at this level for a total of 12 months prior to receiving consideration for Level B. Available programming activities:

   a. Individual exercise – two hours per day.

   b. Individual religious counseling.

   c. All C level inmates will receive a visit from the mental health team at least once every 30 days and will be given the opportunity to participate in a private out-of-cell meeting with mental health staff.

   d. Individual education.

   e. Legal help from inmate legal assistants, on a non-contact visit basis, not to exceed a total of two hours each week as scheduled by the unit manager/designee.

   f. Non-contact visitation twice a week for no more than one hour per visit. After 12 months at Level C, a contact visit may be granted by the Associate Warden of Security based upon a favorable review of Section VI. (I)(5,6,7,8,10, and 11).

   g. Limited to one package every six months.

   h. Restraints shall be mandatory for all inmates classified to this level.

   i. May participate in in-cell arts and crafts on an individual basis, at the discretion of the Warden, according to demonstration of appropriate behavior.

2. Level B: An inmate must remain at this level for 9 months, disciplinary-free, prior to receiving consideration for Level A placement pending review in accordance with Section VI.(F). Available programming activities:

   a. <u>Participate in groups of six or less for the following</u>:

      (1) Education.

      (2) Exercise – a minimum of two hours per day.

      (3) Religious services/activities.

      (4) Individual group counseling.

      (5)    Legal help from inmate legal assistants, on a non-contact visit basis, not to exceed a total of two hours each week as scheduled by the unit manager/designee.

  b.    Contact or non-contact visits, at the discretion of the Associate Warden of Security –twice a week for a total of three hours maximum.

  c.    Limited to one package every three months.

  d.    Restraints shall be mandatory for all inmates classified to this level. Restraints may be removed while an inmate is in a conference area or treatment area at the discretion of the unit manager. Wardens shall develop policies and procedures setting forth restraint procedures when inmates are out of their cells.

3.    Level A: Inmates at this level must maintain an overall exceptional rating in the unit and remain free from disciplinary convictions, pending review in accordance with Section VI (D). Available programming activities:

  b.    Participation in the following activities in groups (of other inmates under sentence of death) at the discretion of the unit manager:

      (1)    Exercise - a minimum of two hours per day.

      (2)    Education.

      (3)    Arts and crafts, if available.

      (4)    Religious services/activities.

      (5)    Individual or group counseling.

      (6)    Group dinners, if appropriate and approved by the unit manager.

      (7)    Cards and certain boards games, if appropriate and approved by the unit manager.

      (8)    Use of active/passive multipurpose rooms as designated by the unit manager.

      (9)    Law clerk or legal advisor from the population shall visit in the non-contact visiting area not to exceed one hour per day as scheduled by the unit manager, Monday through Friday. Access to library shall be established in local policies and procedures.

      (10)    Movement in and out of their cells within the unit and exercise yards without restraints.

  c.    Contact visits – twice a week for a total of three hours or more, depending on space availability, as approved by the Associate Warden of Security.

      d.      Limited to one package every three months.

L.     If an inmate on any level elects not to participate in recreation or group programming for a period of thirty days or more, the unit manager shall notify the Behavioral Health Administrator.

     a.     The Behavioral Health Administrator shall upon receipt of such notice arrange for a Qualified Mental Health Professional (QMHP) to conduct an assessment of the inmate's mental health condition.

     b.     Upon completion of the assessment, the QMHP shall recommend to the Behavioral Health Administrator and the unit manager any recommendation for an immediate clinical intervention. The QMHP shall in all events document the findings and recommendations from the assessment, on the problem-oriented, CR-1884.

M.    Regardless of the disciplinary sanction imposed on an offender by reason of conviction for a disciplinary infraction, an offender on death row may be demoted one level or two levels. When an offender receives a demotion, they will not be eligible for a level increase for a period of between 3 and 12 months depending on the severity of the infraction, as determined by the following matrix:

| Offender level | Disc. Class | New Level | Consideration |
| --- | --- | --- | --- |
| A | A | C | 12 months |
| A | B | B | 6 months |
| A | C | B | 3 months |
| | | | |
| B | A | C | 12 months |
| B | B | C | 6 months |
| B | C | C | 3 months |
| | | | |
| C | A | C | 12 months |
| C | B | C | 6 months |
| C | C | C | 3 months |

N.    Program assignments to Level A or B and the housing assignments of inmates under sentence of death who is permanently assigned to a facility other than RMSI or DJRC shall be approved or disapproved by the Assistant Commissioner of Prisons/designee. The Assistant Commissioner of Prisons/designee shall consider all relevant circumstances including, but not limited to, the following:

    1.     The safety of the inmate.

    2.     The safety of other inmates.

        3.      The security of the institution.

O.     Any exceptions to this policy require the prior approval of the Commissioner.

P.     The Warden of any facility permanently housing inmates under the sentence of death shall develop local policies and procedures to administer this policy. These policies require the prior approval of the Assistant Commissioner of Prisons.

Q.     News Media - contact with news media shall be in accordance with Policy #103.04.

R.     Inmates in all levels shall be in full restraints when he/she leaves the building for medical, court, etc. Inmates assigned to DeBerry Special Needs Facility for medical/behavioral health reasons will be treated as a Level C inmate.

VII.     <u>ACA STANDARDS</u>: N/A

VIII.     <u>EXPIRATION DATE</u>: February 1, 2025

| Subject: | PROGRAM LEVELS FOR INMATES UNDER SENTENCE OF DEATH |

## TENNESSEE DEPARTMENT OF CORRECTION
### UNIT REVIEW PANEL HEARING

INSTITUTION:

Inmate Name ____ Last, First, Middle (Please Print) ____ TDOC ID ____ Current Level ____

Summary of inmate's current circumstances and comments regarding program level:

HEARING DATE: ____ REPORTING PERIOD ____ from ____ to ____

**ACTION TAKEN BY PANEL:**

____ Recommend continue at current level

____ Recommend level change to Level ____

____ Member ____ Member ____ Chairperson

**COMMENTS:**

**UNIT MANAGER'S ACTION:** ____ APPROVE ____ DISAPPROVE

**COMMENTS:**

APPROVED: ____ Signature ____ Date

____ Warden ____ Date
(For Level 1 changes only)

____ APPROVED ____ DISAPPROVED   For death row inmates assigned to facilities other than RMSI and RMSI only

____ Assistant Commissioner of Prisons ____ Date

CR-2637 (Rev. 09-20)   Original –Inmate Institutional Record   Copy–Inmate   Copy–Case Manager   RDA 1100

---

## TENNESSEE DEPARTMENT OF CORRECTION
### CLASSIFICATION APPEAL

INSTITUTION: ____

TO: ____ WARDEN ____ DATE: ____
____ DIRECTOR OF CLASSIFICATION/PROGRAMS ____ INSTITUTION: ____

FROM: ____ Inmate Name ____ TDOC ID ____

(For appeal directed to Director of Classification Programs: attached are copies of the Needs Assessment, Custody Assessment, and Summary Sheet of the classification action I am hereby appealing. I understand if these documents are not attached, this appeal will be returned to me unanswered.)

I hereby appeal the attached classification action for the following reason(s):

____ Inmate Signature

---

TO: ____ WARDEN ____ DATE: ____

FOR COMPLETION BY WARDEN/DIRECTOR

____ No action   Required copies of classification action not received

Disposition: ____ VETO classification action
____ UPHOLD classification action

Reason(s) for disposition:

____ Warden/Director Signature ____ Date

CR-3304 (Rev. 01-22)   Duplicate as Needed   RDA 1167

**Subject:** PROGRAM LEVELS FOR INMATES UNDER SENTENCE OF DEATH

---

## TENNESSEE DEPARTMENT OF CORRECTION
## CELL INSPECTION

INSTITUTION

INMATE NAME

TDOC ID

CELL LOCATION: _____ FOR THE MONTH: _____ , 20 ___

### WEEKS / DATES INSPECTED

| AREA | (1) Problem | No Problem | (2) Problem | No Problem | (3) Problem | No Problem | (4) Problem | No Problem |
|------|---|---|---|---|---|---|---|---|
| View into Cell | | | | | | | | |
| Walls | | | | | | | | |
| Ceiling | | | | | | | | |
| Light Fixture | | | | | | | | |
| Toilet | | | | | | | | |
| Sink | | | | | | | | |
| Air Vent | | | | | | | | |
| Bed | | | | | | | | |
| Property | | | | | | | | |
| Overall Rating | | | | | | | | |

INSPECTED BY: _____  TITLE _____

RATING LEGEND
1 – Below Satisfactory
2 – Satisfactory
3 – Above Satisfactory

Documentation of Problem Areas (include week / dates):

1) _____
2) _____
3) _____
4) _____

CR-3119 (Rev. 01-22)   Distribution: Original – Inmate Institutional File   Copy - Inmate   RDA 1100

---

## TENNESSEE DEPARTMENT OF CORRECTION
## UNIT ADJUSTMENT

INSTITUTION

INMATE NAME: _____

Cell Location: _____   TDOC ID: _____

For Month of _____ , 20 ___

Instructions:  Provide detailed information on observed inmate behavior, inmates' adjustment to unit activities, and a description of the inmates' interaction with staff and other inmates.  Include dates observed.

Week 1: _____

_____

Staff Signature _____

Week 2: _____

Staff Signature _____

Week 3: _____

Staff Signature _____

Week 4: _____

Staff Signature _____

Week 5: _____

Staff Signature _____

CR-3343 (Rev. 01-22)   White – Inmate Institutional File   Canary – Casemanager   Duplicate as Needed

